UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

INDIAN HARBOR INSURANCE COMPANY,    :

                 :

         Plaintiff,    :

                 :

    -against-    :    No. 12 Civ. 5787 (JGK)

                 :

THE CITY OF SAN DIEGO,    :

                 :

         Defendant.    :

                 :

CALIFORNIA STATE ASSOCIATION OF    :
COUNTIES EXCESS INSURANCE AUTHORITY    :
and INSURANCE COMPANY OF THE STATE OF    :
PENNSYLVANIA,    :

                 :

         Defendant-Intervenors.    :

------------------------------------------------------------------X

## DEFENDANT-INTERVENOR'S RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS & STATEMENT OF ADDITIONAL MATERIAL FACTS IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1(b), defendant-intervenor California State Association of

Counties Excess Insurance Authority ("CSAC-EIA") submits the following Response to

Plaintiff's Statement of Undisputed Material Facts dated February 1, 2013, and Statement of

Additional Material Facts in Opposition to Plaintiff's Motion for Summary Judgment.

**RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.    The Indian Harbor insurance policy that is the subject of this action names the

City as an Additional Named Insured. (See Declaration of Max H. Stern ("Stern Dec."), Exh. 1,

Endorsement #005.)

    **CSAC-EIA Response:** Undisputed.

2.    That policy provides, in relevant part, as follows:

L.    Choice of Law -- All matters arising hereunder including questions related to the validity interpretation, performance and enforcement of this Policy shall be determined in accordance with the law and practice of the State of New York (notwithstanding New York's conflicts of law rules). (Stern Dec., Exh. 1, p. 13.)

**CSAC-EIA Response:** Undisputed.

3.    The policy also provides:

A.    As a condition precedent to the coverage hereunder, in the event any CLAIM is made against the INSURED for LOSS or REMEDIATION EXPENSE, or any POLLUTION CONDITION is first discovered by the INSURED that results in a LOSS or REMEDIATION EXPENSE:

1.    The INSURED shall forward to the Company or to any of its authorized agents every demand, notice, summons, order or other process received by the INSURED or the INSURED's representative as soon as practicable; and

2.    The INSURED shall provide to the Company, whether orally or in writing, notice of the particulars with respect to the time, place and circumstances thereof, along with the names and addresses of the injured and of available witnesses. In the event of oral notice, the INSURED agrees to furnish to the Company a written report as soon as practicable. (Stern Dec., Exh. 1, p. 9.)

**CSAC-EIA Response:** Undisputed.

4.    The following definitions are included in the policy:

D.    **CLAIM** means any demand(s), notice(s) or assertion(s) of a legal right alleging liability or responsibility on the part of the INSURED and shall include but not be limited to lawsuit(s), petition(s), order(s) or government and/or regulatory action(s), filed against the INSURED.

J.    **LOSS** means monetary judgment, award or settlement of compensatory damages as well as related punitive, exemplary or multiplied damages where insurance coverage is allowable by law arising from . . . PROPERTY DAMAGE.

S.    **PROPERTY DAMAGE** means:

1.    physical injury to or destruction of tangible property, including the resulting loss of use thereof, and including the personal property of third parties;

2.    loss of use of such property that has not been physically injured or destroyed;

3.    diminished third party property value; and/or

4.    NATURAL RESOURCE DAMAGE, Caused by any POLLUTION CONDITION.

PROPERTY DAMAGE does not include REMEDIATION EXPENSE. (Stern Dec., Exh. 1, pp. 2-4.)

**CSAC-EIA Response:** Undisputed.

5.    The policy contains limits of liability of $10,000,000 each POLLUTION CONDITION, $50,000,000 aggregate liability, and a $500,000 Self-Insured Retention applicable to each POLLUTION CONDITION. (Stern Dec., Exh. 1, p. 3; Declaration of J. Robert McMahon ("McMahon Dec.") ¶ 4.)

**CSAC-EIA Response:** Undisputed.

6.    Per Endorsement #025, the policy contains a sublimit of $10,000,000 each POLLUTION CONDITION, and a $10,000,000 total Aggregate Liability shall apply to each INSURED.  (Stern Dec., Exhibit 1, Endorsement #025; McMahon Dec. ¶ 4.)

**CSAC-EIA Response:**  Undisputed.

7.    The policy was issued from Exton, Pennsylvania and delivered in Newport Beach, California; it was not issued or delivered in New York.  (Stern Dec., Exh. 1, pp. 1, 3; McMahon Dec. ¶ 5.)

**CSAC-EIA Response:**  Disputed.  The cited evidence does not support this fact. Indeed, the Indian Harbor Policy does not refer to "Exton" or "Pennsylvania," and nowhere does the face of the Policy indicate from where the Policy was issued.  (Hnatt Decl. Ex. A (McMahon Depo. Tr. at 44:4-47:11))[1]  The Indian Harbor Policy was issued in New York.  (*See* ¶¶ 53-64 of Defendant-Intervenor's Statement of Additional Material Facts In Opposition to Plaintiff's Motion for Summary Judgment below and the record sources cited therein.)

8.    The City has stated that the underlying claims seek almost $40 million from the City. (See City Letter, at Docket, Doc. No. 5.)

**CSAC-EIA Response:**  Undisputed.

9.    The City received notice of a claim by The Grande North at Santa Fe Place Homeowners Association on August 13, 2009 through a form filed with the City entitled "Claim Against the City of San Diego."  (Stern Dec., Exh. 2; Request for Judicial Notice ("RJN") ¶ 1.)

**CSAC-EIA Response:**  Undisputed.

---

[1]    "Hnatt Decl." refers to the Declaration of Kelly M. Hnatt in Opposition to Indian Harbor's Motion for Summary Judgment, which is being filed contemporaneously herewith.

10.     This form alleged:

The Association is informed and believes and thereon alleges that sewer gases containing hydrogen sulfide (among other things) in the City of San Diego's 36 inch sewer main along Pacific Coast Highway are migrating into the Association's building systems causing corrosion and other damage to, among other things, the building's waste and vent systems.

The sewer main at issue is owned and maintained by the City of San Diego.

(Id.)

The known property damage at this time presently consists of corroded waste and vent pipes, as well as investigative and legal fees.

**CSAC-EIA Response:** Undisputed.

11.     The City denied the claim on August 24, 2009, stating that it was "not presented within the 6 (six) months after the event or occurrence as required by law." (Stern Dec., Exh. 3; RJN ¶ 2.)

**CSAC-EIA Response:** Undisputed.

12.     On September 9, 2009, counsel for the Grande North HOA wrote a letter to the City regarding "a potentially deadly condition emanating from the City property." (Stern Dec., Exh. 4.)

**CSAC-EIA Response:** Undisputed.

13.     The City reiterated its denial of the Grande North claim in a September 29, 2009 letter. (Stern Dec., Exh. 5; RJN ¶ 3.)

**CSAC-EIA Response:** Undisputed.

14.     The Grande North HOA filed a lawsuit against the City and other defendants on September 9, 2009.  (Stern Dec., Exh. 7; RJN ¶ 4.)

**CSAC-EIA Response:** Undisputed.

15.     As against the City, the Grande North complaint contains causes of action for Inverse Condemnation, Dangerous Condition, Nuisance, Trespass, and Injunctive Relief. (Id.)

**CSAC-EIA Response:** Undisputed.

16.     The lawsuit seeks costs for correction of the alleged problems, damages for diminution in value, relocation costs, and certain repairs. (Id.)

**CSAC-EIA Response:** Undisputed.

17.     The complaint was served on the City on September 11, 2009. (Stern Dec., Exh. 8; RJN ¶ 5.)

**CSAC-EIA Response:** Undisputed.

18.     The City filed an answer to the Grande North lawsuit on November 2, 2009. (Stern Dec., Exh. 9; RJN ¶ 6.)

**CSAC-EIA Response:** Undisputed.

19.     A First Amended Complaint was filed in the Grande North lawsuit on June 23, 2011, adding class allegations. (Stern Dec., Exh. 10; RJN ¶ 7.)

**CSAC-EIA Response:** Undisputed.

20.     In an October 19, 2011 memorandum from the Office of the City Attorney of the City of San Diego to California State Association of Counties Excess Insurance Authority, the City stated that the Grande North HOA was seeking $29 million in damages. (Stern Dec., Exh. 11.)

**CSAC-EIA Response:** Undisputed.

21.     A Second Amended Complaint was filed on December 23, 2011, adding allegations related to attorneys' fees. (Stern Dec., Exh. 12; RJN ¶ 8.)

**CSAC-EIA Response:** Undisputed.

22.     The City provided notice to Indian Harbor of the Grande North Claim on March 26, 2012 in an email to Indian Harbor by the City's broker. (Stern Dec., Exh. 13; Declaration of J. Robert McMahon ("McMahon Dec."), ¶ 6.)

**CSAC-EIA Response:** Disputed. The City provided notice of the Grande North Claim to Indian Harbor on March 23, 2012. (*See* Castillo Del Muro Decl. (Dkt. No. 57) ¶ 7)

23.     On April 4, 2012, Indian Harbor acknowledged receipt of the notice. (Stern Dec., Exh. 14; McMahon Dec., ¶ 6.)

**CSAC-EIA Response:** Undisputed.

24.     The April 4, 2012 letter reserved Indian Harbor's rights to deny coverage based on the City's late notice of the claim and requested various information related to the claim. (Id.)

**CSAC-EIA Response:** Undisputed.

25.     The City provided initial information and 23 CDs (containing the City's production in the Grande North matter, bates range 1 to 37,050) in an April 17, 2012 letter, and a CD of pleadings in an April 19, 2012 letter. (Stern Dec., ¶ 16.)

**CSAC-EIA Response:** Undisputed.

26.     In a May 4, 2012 letter, Indian Harbor's coverage counsel followed up with the City regarding some of the requests for information set forth in Indian Harbor's April 4, 2012 letter and requested additional documents. (Id.)

**CSAC-EIA Response:** Undisputed.

27.     On May 24, 2012, the City provided Indian Harbor with an additional 25 CDs in response to those requests, totaling more than 60,000 pages. (Id.)

**CSAC-EIA Response:** Undisputed.

28.     After completing its investigation, on July 27, 2012 Indian Harbor denied coverage to the City based on the City's late notice of the Grande North claim. (Stern Dec., Exh. 14; McMahon Dec., ¶ 7.)

**CSAC-EIA Response:** Undisputed.

29.     The City received notice of a claim by 235 On Market Homeowners Association on May 19, 2011 through a form filed with the City entitled "Claim Against the City of San Diego." (Stern Dec., Exh. 16; RJN ¶ 9.)

**CSAC-EIA Response:** Undisputed.

30.     This form alleged as follows: "There is a significant odor and corrosion problem in the building waste and vent system. This is directly attributed to sewer gasses containing hydrogen sulfide (among other things) which originate in the City sewer main." (Id.)

**CSAC-EIA Response:** Undisputed.

31.     The City denied the claim in a letter dated June 23, 2011. (Stern Dec., Exh. 17; RJN ¶ 10.)

**CSAC-EIA Response:** Undisputed.

32.     The 235 On Market HOA filed suit against the City and other defendants on September 2, 2011. (Stern Dec., Exh. 19; RJN ¶ 11.)

**CSAC-EIA Response:** Undisputed.

33.     As against the City, the complaint contains causes of action for Inverse Condemnation and Dangerous Condition. (Id.)

**CSAC-EIA Response:** Undisputed.

34.     The lawsuit alleges that "the Subject Property has been repeatedly damaged and is continuing to be damaged by introduction of hydrogen sulfide gases from the CITY's Main

Sewer Line into the Subject Project, which has caused corrosion of the plumbing lines and sewage backups." (Id.)

       **CSAC-EIA Response:** Undisputed.

35.    The lawsuit seeks costs for correction of the alleged problems, damages for diminution in value, relocation costs, and certain repairs. (Id.)

       **CSAC-EIA Response:** Undisputed.

36.    The complaint was served on the City on September 9, 2011. (Stern Dec., Exh. 20; RJN ¶ 12.)

       **CSAC-EIA Response:** Undisputed.

37.    The City filed an answer on October 4, 2011. (Stern Dec., Exh. 21; RJN ¶ 13.)

       **CSAC-EIA Response:** Undisputed.

38.    The City provided first notice to Indian Harbor of the 235 On Market Claim on May 25, 2012 through an email from the broker. (Stern Dec., Exh. 22; McMahon Dec., ¶ 8.)

       **CSAC-EIA Response:** Disputed. The City provided notice of the 235 On Market Claim to Indian Harbor on May 24, 2012. (*See* Castillo Del Muro Decl. (Dkt. No. 57) ¶ 10)

39.    Indian Harbor acknowledged receipt of the notice on June 7, 2012. (Stern Dec., Exh. 23; McMahon Dec., ¶ 8.)

       **CSAC-EIA Response:** Undisputed.

40.    This letter reserved Indian Harbor's rights to deny coverage on a number of bases, including late notice, and requested information from the City. (Id.)

       **CSAC-EIA Response:** Undisputed.

41.     The City provided additional information to Indian Harbor on June 7, 2012. (McMahon Dec., ¶ 8.)

**CSAC-EIA Response:** Undisputed.

42.     On July 27, 2012, Indian Harbor denied coverage to the City based on the City's late notice of the 235 On Market Claim. (Stern Dec., Exh. 24; McMahon Dec., ¶ 9.)

**CSAC-EIA Response:** Undisputed.

43.     On April 17, 2009, Element Owners Association filed a lawsuit against Centex Home, Centex Real Estate Corporation, Centex Construction Company, Inc., and Balfour Beatty Construction Company (collectively, "Centex") and others, alleging various construction defects related to an eight-story condominium building. (Stern Dec., Exh. 26; RJN ¶ 17.)

**CSAC-EIA Response:** Undisputed.

44.     Centex sent the City a letter on March 28, 2012 that enclosed a "Claim Against the City of San Diego" that was filed with the City on April 2. (Stern Dec., Exh. 27; RJN ¶ 14.)

**CSAC-EIA Response:** Undisputed.

45.     The claim alleged: "On February 3, 2012, parties to the lawsuit Element Owners Association v. Centex Homes, et al., removed and inspected cast iron waste piping at the above referenced address in response to Plaintiff's claims of defective and leaking pipes. The inspections revealed crystallization on the piping as a result of hydrochloric gas emissions emanating from the city of San Diego's sewer system." (Id.)

**CSAC-EIA Response:** Undisputed.

46.     The City initially responded to the claim on April 9, 2012, noting an insufficiency in the submission. (Stern Dec., Exh. 28; RJN ¶ 15.)

**CSAC-EIA Response:** Undisputed.

47. The City formally denied the claim by Centex on May 11, 2012. (Stern Dec., Exh. 29; RJN ¶ 16.)

**CSAC-EIA Response:** Undisputed.

48. Centex filed a motion for relief from the claim requirement and leave to file a cross-complaint against the City, which was denied by the court. (Stern Dec., Exh. 30; RJN ¶ 18.)

**CSAC-EIA Response:** Undisputed.

49. The City provided first notice of the Centex Claim to Indian Harbor on May 25, 2012, through an email from the broker. (Stern Dec., Exh. 31; McMahon Dec., ¶ 10.)

**CSAC-EIA Response:** Disputed. The City provided notice of the Centex Claim to Indian Harbor on May 24, 2012. (*See* Castillo Del Muro Decl. (Dkt. No. 57) ¶ 12)

50. Indian Harbor acknowledged receipt of the notice on June 7, 2012. (Stern Dec., Exh. 32; McMahon Dec., ¶ 10.)

**CSAC-EIA Response:** Undisputed.

51. This letter reserved Indian Harbor's rights to deny coverage on a number of bases, including late notice, and requested information from the City. (Id.)

**CSAC-EIA Response:** Undisputed.

52. The City provided additional information to Indian Harbor on June 7, 2012. (McMahon Dec., ¶ 10.)

**CSAC-EIA Response:** Undisputed.

## DEFENDANT-INTERVENOR'S STATEMENT OF ADDITIONAL MATERIAL FACTS IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

53. The insurance policy that is the subject of this action (Pollution & Remediation Legal Liability Policy No. PEC002076401) (the "Indian Harbor Policy") was issued by Indian

Harbor Insurance Company ("Indian Harbor"). (Hnatt Decl. Ex. A (McMahon Depo. Tr. at 107:18-108-5))

54.     The Indian Harbor Policy, at page 1, identifies Indian Harbor as the "Company Providing Coverage." (Stern Decl. Ex. 1 (Dkt. 52-1) at Page 2 of 83)

55.     The Indian Harbor Policy, at page 4, contains the signature of Dennis Kane, and identifies Mr. Kane's signature as that of Indian Harbor's "Authorized Representative." (Stern Decl. Ex. 1 (Dkt. 52-1) at Page 5 of 83; Hnatt Decl. Ex. A (McMahon Depo. Tr. at 102:15-103:20))

56.     Attached to the Indian Harbor Policy is an "In Witness Endorsement," which states "IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company." (Stern Decl. Ex. 1 (Dkt. 52-1) at Page 19 of 83)

57.     The In Witness Endorsement contains the signatures of Dennis Kane and Toni Ann Perkins. (*Id.*) It identifies Mr. Kane as the President of Indian Harbor, and Ms. Perkins as Secretary. (*Id.*)

58.     At the time the Indian Harbor Policy was issued, Mr. Kane was the President of Indian Harbor. (Hnatt Decl.. Ex. A (McMahon Tr. at 17:22-18:10; 108:6-12)) Mr. Kane signed the Indian Harbor Policy as Indian Harbor's authorized representative. (*Id.* at 110:9-20)

59.     At the time the Indian Harbor Policy was issued, Mr. Kane was located in New York. (*Id.* at 16:22-25)

60.     Mr. Kane and Ms. Perkins were the only Indian Harbor individuals associated with the Indian Harbor Policy. (*Id.* at 12:14-13:16)

61.     Indian Harbor's representative, Mr. McMahon, testified that the underwriting and physical preparation of the Policy was performed by employees of XL Specialty Insurance Company, a company separate from Indian Harbor. (*Id.* at 13:5-16, 13:24-14:4)

62.     Mr. McMahon testified that, "All of the underwriting for [the Policy] was done in Exton [Pennsylvania]. The underwriter was in Exton, the underwriting assistant, the underwriting support group that prints the policies was all based in Exton, so it was all done in Exton." (*Id.* at 14:21-15:2))

63.     The Indian Harbor Policy nowhere refers to "Exton," or "Pennsylvania." (*Id.* at 47:6-11)

64.     Nothing on the face of the Indian Harbor Policy indicates from where the Policy was issued. (*Id.* at 44:4-47:5)

65.     The Indian Harbor Policy was issued in New York. (*See supra* ¶¶ 53-61, 63-64 and the record sources cited therein)

Dated: August 9, 2013

Respectfully submitted,

WILLKIE FARR & GALLAGHER LLP

Mitchell J. Auslander
Kelly M. Hnatt
Christopher J. Miritello
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000

*Attorneys for Defendant-Intervenor California State Association of Counties Excess Insurance Authority*