**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
                        :

INDIAN HARBOR INSURANCE COMPANY,   :    Case No. 12 CIV 5787 (JGK)
                        :           ECF Case

        Plaintiff,        :

                        :

      -against-        :

                        :

THE CITY OF SAN DIEGO,        :    Courtroom:    12B
                        :    Judge:      Hon. John G. Koeltl

        Defendant.    :

                        :    Complaint Filed:  July 27, 2012
                        :    F.A.C. Filed:     August 14, 2012
                        :
-------------------------------------------------------------X

## <u>INDIAN HARBOR INSURANCE COMPANY'S RESPONSE TO THE CITY OF SAN DIEGO AND CALIFORNIA STATE ASSOCIATION OF COUNTIES EXCESS INSURANCE AUTHORITY'S JOINT MEMORANDUM OF LAW IN OPPOSITION TO INDIAN HARBOR INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT</u>

Dated: August 23, 2013

                Max H. Stern (*pro hac vice*)
                Jessica E. La Londe (*pro hac vice*)
                DUANE MORRIS LLP
                One Market, Spear Tower, Suite 2000
                San Francisco, CA 94105-1104
                Telephone: 415.957.3000
                Facsimile: 415.957.3001
                mhstern@duanemorris.com
                jelalonde@duanemorris.com

                Sheila Raftery Wiggins
                Jessica A. Bohl
                DUANE MORRIS LLP
                1540 Broadway
                New York, NY 10036
                Tel. (212) 692-1000
                Fax. (212) 692-1020
                srwiggins@duanemorrs.com
                jabohl@duanemorris.com

                Attorneys for Plaintiff Indian Harbor Insurance
                Company

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ...........................................................................................................1

ARGUMENT ...............................................................................................................2

I.    New York Ins. Code section 3420(a)(5) Does Not Apply Here Because the Indian Harbor Policy Was Not Issued or Delivered in New York.........................................2

    A.    All Activities Related to Issuing This Specific Policy, Including the Affixing of Signatures, Took Place in Exton, Pennsylvania .................................. 3

    B.    "Issued" Does Not Mean "Signed" in This Context ................................. 5

    C.    Even If "Issued" Could Mean "Signed," The Location of Mr. Kane's Original Signature Would Be Irrelevant ...................................... 8

    D.    There Are No Fact Issues Precluding Summary Judgment ................... 9

II.    Application of New York Law Pursuant to the Parties' Contractual Agreement to Do So Is Not Unconstitutional .................................................................11

    A.    Defendants Overstate the Threshold for Constitutionality ................... 11

    B.    Application of New York Law is Not Arbitrary or Fundamentally Unfair ......... 12

        1.    New York Law Should Apply Because There Are Significant Transactional Contacts to New York ................................... 12

        2.    New York Law Should Apply Because There Are Sufficient Party Contacts to New York ................................................... 14

        3.    New York Law Should Apply Because Application of New York Law is Not "Fundamentally Unfair" ................................... 15

    C.    Public Policy Arguments Do Not Compel Any Different Result ....................... 17

III.    New York's "Timely Notice" Rule Applies ....................................................18

IV.    The Centex Claim Was Late and Coverage is Barred as a Matter of New York Law ..........................................................................................................23

CONCLUSION ..........................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allstate Ins. Co. v. Hague*
449 U.S. 302 (1981)....................................................................2, 11-12, 14-17

*American Continental Properties, Inc. v. National Union Fire Insurance Company of Pittsburgh, P.A.*
200 A.D.2d 443 (N.Y. App. Div. 1st Dep't 1994)........................................ 9-10

*American Home Assurance Co. v. Republic Ins. Co.*
984 F.2d 76 (2d Cir. N.Y. 1993)................................................................. 24-25

*Argo Corp. v. Greater N.Y. Mut. Ins. Co.*
4 N.Y.3d 332 (N.Y. 2005) ...............................................................................24

*Avondale v. Sovereign Camp*
134 Neb. 717 (1938) ..................................................................................... 7-8

*Bowers v. National Collegiate Athletic Ass'n, Act, Inc.*
151 F.Supp.2d 526 (D.N.J. 2001) .....................................................................15

*Boyce Thompson Inst. for Plant Research, Inc. v. Insurance Co. of North America*
751 F.Supp. 1137 (S.D.N.Y. 1990).................................................................24

*Brandon v. Nationwide Mut. Ins. Co.*
97 N.Y.2d 491 (2002) .....................................................................................19

*Briggs Ave. LLC v. Insurance Corp. of Hannover*
11 N.Y.3d 377 (2008) ...............................................................................19, 24

*Bristol Investment Fund Ltd. v. ID Confirm, Inc.*
2008 NY Slip Op 30128U (N.Y. Sup. Ct. Jan. 14, 2008)..................................13

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986).........................................................................................10

*Coleman v. New England Mut. Life Ins. Co.*
236 Mass. 552 (1920) .................................................................................... 7-8

*Cuccioli v. Jekyll & Hyde Neue Metropol Bremen Theater Produktion GMBH & Co.*
150 F.Supp.2d 566 (S.D.N.Y. 2001)..........................................................11, 15

*Hanson Production Co. v. Americas Insurance Co.*
108 F.3d 627 (5th Cir. 1997) ....................................................................... 20-21

*Hernandez v. Gulf Group Lloyds*
875 S.W.2d 691 (Tex. 1994)........................................................................ 20-21

*Intercontinental Planning, Ltd. v. Daystrom, Inc.*
24 N.Y.2d 372 (1969) ........................................................................................8

*Lehman Bros. Commercial Corp. v. Minmetals Int'l Nonferrous Metals Trading Co.*
179 F.Supp.2d 118 (S.D.N.Y. 2000)....................................................................11, 13, 17

*Lincolnshire Mgmt. v. Seneca Ins. Co.*
2002 Cal. App. Unpub. LEXIS 8669 (Cal. App. 4th Dist. Sept. 16, 2002).....................18

*Marino v. New York Telephone Co.*
944 F.2d 109 (2d Cir. 1991)...........................................................................................21-22

*Mighty Midgets, Inc. v. Centennial Ins. Co.*
47 N.Y.2d 12 (1979)..............................................................................................................24

*Phillips Petroleum Co. v. Shutts*
472 U.S. 797 (1985)........................................................................................................14-15

*Reddington v. Staten Island Univ. Hosp.*
511 F.3d 126 (2d Cir. N.Y. 2007)...........................................................................................5

*Rosco, Inc. v. TIG Ins. Co.*
1996 U.S. Dist. LEXIS 18697 (N.D. Cal. Dec. 5, 1996), *reversed by Rosco, Inc. v. TIG Ins. Co.,* 1998 U.S. App. LEXIS 2745
(9th Cir. Cal. Feb. 18, 1998).................................................................................................18

*Rosner v. Metro. Property & Liability Ins. Co.*
96 N.Y.2d 475 (2001)........................................................................................................6, 8

*Schulman Inv. Co. v. Olin Corp.*
514 F.Supp. 572 (S.D.N.Y. 1981).........................................................................................24

*Sheehan Constr. Co. v. Cont'l Cas. Co.*
938 N.E.2d 685 (Ind. 2010).................................................................................................22

*Simpson v. Term Industries, Inc.*
126 A.D.2d 484 (N.Y. App. Div. 1st Dep't 1987)...............................................................10

*Smith v. Stonebridge Life Ins. Co.*
No. Civ. 03-1006, 2003 WL 21909567 (D. Minn. Aug. 8, 2003) ...................................14

*Sorbara Constr. Corp. v. AIU Ins. Co.*
11 N.Y.3d 805 (2008).............................................................................................................19

*Stone v. Yan*
125 A.D. 94 (N.Y. App. Div. 4th Dep't 1908) ...................................................................7-8

*Stringham v. Mutual Ins. Co.*
44 Ore. 447 (1904)...............................................................................................................7-8

*Sun Forest Corp. v. Shvili*
152 F.Supp.2d 367 (S.D.N.Y. 2001).....................................................................................13

*Supply & Building Co. v. Estee Lauder Int'l, Inc.*
No. 95 Civ. 8136, 2000 U.S. Dist. LEXIS 2086 (S.D.N.Y. Feb. 25, 2000) .....................17

*Taggert v. Security Ins. Co. of New Haven, Conn.*
   277 A.D. 1051 (N.Y. App. Div. 2nd Dep't 1950) ........................................ 7-9

*Unigard Sec. Ins. Co. v North Riv. Ins. Co.*
   79 N.Y.2d 576 (1992) ........................................................................... 19

*Village of Sylvan Beach v. Travelers Indem. Co.*
   55 F.3d 114 (2d Cir. N.Y. 1995) ........................................................... 23

*Weeks Marine, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n*
   2011 U.S. Dist. LEXIS 95358 (S.D.N.Y. 2011) ................................... 20

**Statutes**

California Insurance Code section 386 ............................................................ 9

CPLR 3212 ..................................................................................................... 9

N.Y. GOL § 5-1401 ................................................................................. 17-18

New York Ins. Code section 3420 ..................................................... 10, 20, 22

New York Ins. Code section 3420(a) ............................................................ 20

New York Ins. Code section 3420(a)(5) ....................... 2-3, 5-6, 10, 16-19, 22

New York Ins. Code section 3420(c)(2)(A) ................................................. 22

New York Ins. Code section 3420(i) ............................................................ 20

New York Ins. Code section 3425(a)(7). ....................................................... 6

**Other Authorities**

Black's Law Dictionary 836 [7th ed 1999] .................................................... 6

Fed. R. Civ. Pro. 56 ..................................................................................... 10

Plaintiff Indian Harbor Insurance Company ("Indian Harbor") respectfully submits this response to The City of San Diego ("City") and California State Association of Counties Excess Insurance Authority ("CSAC")'s (collectively "Defendants") Joint Memorandum of Law in Opposition to Indian Harbor Insurance Company's Motion For Summary Judgment.

## INTRODUCTION

The undisputed facts show that the City gave late notice on three claims under an Indian Harbor policy issued in Pennsylvania with a New York choice of law clause, and had adequate contacts to New York to enforce that clause, such that coverage is barred by New York's common law timely notice rule, and is not saved by a statute that is limited to policies issued or delivered in New York. These facts entitle Indian Harbor to summary judgment, and Defendants cannot show a valid reason why Indian Harbor is not entitled to that relief.

Defendants took Indian Harbor's deposition, apparently to try to substantiate an argument that the Indian Harbor policy was issued in New York because that is the location of one officer whose signature appears on the policy. However, the facts disprove this argument: the officer signatures that appear on the policy are electronic signatures that are stored on a computer and are automatically placed on the policy at the time of final assembly and printing in Exton, Pennsylvania. The policy was not "signed" in New York, and the individuals whose signatures appear on the policy never did anything with respect to this specific Indian Harbor policy. *Every* action specifically related to this policy occurred in Pennsylvania. Therefore, the policy was issued there.

In addition, the definition of "issue" urged by Defendants – "sign" – does not comport with the ordinary understanding of that term. "To issue" is commonly defined to mean "to send out or distribute officially," and this common definition has been recognized by the New York Court of Appeals (and the cases cited by Defendants). Here, the policy was assembled, executed, sent out and distributed officially in Pennsylvania, not New York. Pennsylvania is where all of the final series of acts necessary to make the contract occurred.

1

Defendants argue for an overstated constitutional test limiting choice of law decisions. As set forth in *Allstate v. Hague*, the constitution does not require both significant transactional and party contacts. In any event, that test is met here. Application of New York law is not arbitrary or fundamentally unfair when the parties contractually agreed that New York law would apply and that New York was an appropriate forum to resolve their disputes. Moreover, Indian Harbor has many significant contacts with New York. In such a situation, applying New York law is logical and justified, and well as within constitutional limitations.

Defendants also argue that this Court should predict that the New York Court of Appeals would change the common law to a notice prejudice rule if it were to decide this issue today. But there is no valid reason to predict that; the Court of Appeals has had that chance and declined to do so. Even after passage of section 3420(a)(5), the New York Court of Appeals has continued to apply the common law timely notice requirement in cases where the statute does not apply, and in fact no other New York court in the years since then has applied the notice prejudice rule to a situation where the statute is inapplicable. Defendants' argument is wishful thinking, at odds with the consistent treatment of this and similar issues by the New York courts.

Lastly, there is no merit to Defendants' argument that the Court should find that the Centex "claim" did not have to be reported because it was not a valid claim when first made. Defendants overstate the infirmity of the original claim. More importantly, a rule of law that an insured only has a duty to report a claim – and its counterpart that an insurer has no such obligation to defend a claim – until that claim is "viable" or valid would be contrary to the modern concept of the duty to defend. Centex made a claim against the City – valid or not – and the City did not report it timely, so coverage is barred as a matter of law.

## **ARGUMENT**

### I.   **New York Ins. Code section 3420(a)(5) Does Not Apply Here Because the Indian Harbor Policy Was Not Issued or Delivered in New York**

New York Insurance Code section 3420(a)(5) can only relieve the City from complying with the strict New York common law timely notice requirement if the Indian Harbor policy was

either issued or delivered in New York.  Defendants admit that the policy was not delivered in New York.  Defendants do argue: (a) that "issued" means "signed," and (b) that the Indian Harbor policy was "signed" in New York.  To prevail, Defendants must demonstrate both, but undisputed facts establish that neither is true.  The Indian Harbor policy was "issued" in Exton, Pennsylvania, where every activity specific to this policy occurred.  Thus, section 3420(a)(5) has no application in this case.

### A.  All Activities Related to Issuing This Specific Policy, Including the Affixing of Signatures, Took Place in Exton, Pennsylvania

In its moving papers, Indian Harbor provided the declaration of J. Robert McMahon – the Line of Business Manager employed by its parent XL Specialty for its line of pollution liability insurance – offering proof the policy at issue was neither issued nor delivered in New York.  After CSAC's intervention in this action, and at its request, this Court permitted the deposition of Mr. McMahon on the process of policy issuance.  At deposition, Mr. McMahon confirmed that all activities specifically related to the Indian Harbor policy at issue in this case occurred in Exton, Pennsylvania: the underwriting, the assembly of the insured's information with policy forms bearing the required signatures, the printing of the assembled policy, and the sending out of the policy.  (*See* Stern Dec. II, Ex. 1 [McMahon Dep.], at 14:21-15:2 ("All of the underwriting for this policy was done in Exton.  The underwriter was in Exton, the underwriting assistant, the underwriting support group that prints the policies was all based in Exton, so it was all done in Exton."); 47:24-48:3 ("[T]his was underwritten in Pennsylvania, it was issued from Pennsylvania and it was delivered to the broker in Newport Beach California."); 48:16-49:9 (explaining the extent of activities in Exton); 73:3-8 ("[Q.] How do those documents support your view that the policy was issued from Exton Pennsylvania?  A. The cover letter is from [Greg] Leinweber, he is a underwriter in Exton[,] on Exton letterhead."); 92:16-93:19 (explaining that underwriting file supports that all activities occurred in Exton).)

Defendants do not dispute that all of this happened in Exton.  Instead, they argue that the policy was issued when "signed" by Dennis Kane, Indian Harbor's President, whose office is in

New York.  Defendants' argument fails because Mr. Kane did not personally sign this particular policy at all – Mr. Kane took no action with respect to this policy other than his supplying an electronic signature for XL Specialty's general use in issuing Indian Harbor policies.

Mr. McMahon explained that the signatures on this Indian Harbor policy were pre-existing electronic signatures stored in a computer system that were automatically placed on two forms ("Declarations" and "In Witness Endorsement") when the policy was assembled and printed *in Exton, Pennsylvania*.  (*See* Stern Dec. II, Ex. 1 [McMahon Dep.], at 15:16-18 ("all the signatures on the policies are all placed in Exton."); 15:21-22 ("It's an electronic signature that's placed on the policy in Exton."); 20:11-12 ("[T]he signatures typically seen on policies are electronic signatures."); 20:24-25 ("[I]t's an electronic signature."); 21:20-22:3 ("[T]he signatures that are in the policies are automatically placed on the appropriate policy endorsements and forms when they're printed in Exton.  They're not physically signed by Mr. Kane or Ms. [Toni Ann] Perkins.  They don't come down and put pen to paper, it's an electronic signature that's stored in a computer system."); 103:13 ("[I]t's [Mr. Kane's signature is] an electronic signature."); 107:3-107:6 ("[T]hese are signatures that are populated automatically and when this form is generated, ILMP 91041208 IHIC, those are the signatures that are placed on it."); 111:20-22 ("[T]hese were electronic signatures that were generated when the documents were printed in Exton.").)  Thus, affixing both signatures to the policy forms and the inputting to those forms of specific information relating to these Defendants took place in Pennsylvania.

Defendants offer as an undisputed fact that Mr. Kane and Ms. Perkins were "the only Indian Harbor individuals involved with the Indian Harbor policy."  (Defendants' SAMF ¶ 60.)[1] However, the testimony establishes they were not "involved" with the issuance of this particular policy at all.  Their involvement was in a general sense only: supplying in advance the required

---

[1] Defendants' brief changes the word "individuals" to "employees" (Opp. at 6), however, there is no evidence that either is in fact an Indian Harbor employee.  The evidence is that they are Indian Harbor officers.

signatures for issuance of policies on behalf of Indian Harbor that were used repeatedly as part of the policy forms for this line of insurance.  The only people involved in creating the specific policy issued to Defendants were people in the Exton, Pennsylvania office – and they are the ones who are responsible for adding the required signatures on the final policy, as they assembled and printed the policy they sent to the insured.  Mr. McMahon further testified that all these individuals in Exton were acting on behalf of Indian Harbor.  (Stern Dec. II, Ex. 1 [McMahon Dep.], at 11:19-24 ("Indian Harbor, per se, does not have a business unit. . . .  Indian Harbor is one of the [companies] on whose paper we issue policies."); 12:8-13 ("Q. So does XL issue policies wordings on behalf of Indian Harbor?  A.  I guess that's a fair statement.  I would say the XL Environmental unit certainly issues PARLL policies on Indian Harbor paper, yes."); 97:13-98:2 ("A. Policies are issued -- Indian Harbor is an XL company -- XL Specialty is an XL company, we issued policies on Indian Harbor paper and other insurance companies so that's the best way I can answer your question.  Q. Was the "we" in that answer XL Specialty?  A. When you're talking about employees, yes, the "we" is XL Specialty, I'm referring to XL Environmental personnel who are employees of XL Specialty Insurance Company that transact business on behalf of and using Indian Harbor paper.").)  The agents of Indian Harbor that issued this policy were employees of its parent that worked in Pennsylvania.

Because the electronic signatures were affixed as part of the policy preparation in Pennsylvania, Defendants' arguments about the meaning of "issued" should be moot, and section 3420(a)(5) does not apply to the Indian Harbor policy.

**B.      "Issued" Does Not Mean "Signed" in This Context**

Defendants' argument for the application of section 3420(a)(5) to excuse the City's late notice also fails because "issued" does not mean "signed" in the context of this statute and this case.  Instead, this Court should construe this provision using the common definition of the term "issue" as meaning the sending out of the completed policy.

"We begin with the text of the statute, giving words of ordinary import in the statute their plain meaning."  *Reddington v. Staten Island Univ. Hosp.*, 511 F.3d 126, 135 (2d Cir. N.Y. 2007)

(citing and quoting N.Y. Stat. Law § 232 ("Words of ordinary import used in a statute are to be given their usual and commonly understood meaning . . . ."); id. § 234 ("Dictionary definitions may be useful as guide posts in determining the sense with which a word was used in a statute . . . .")); *see also Rosner v. Metro. Property & Liability Ins. Co.*, 96 N.Y.2d 475, 479-480 (2001).

The New York Court of Appeals has stated that the common definition of "issue" in the insurance policy context is "to send out or distribute officially." *Rosner*, 96 N.Y.2d at 480 (quoting Black's Law Dictionary 836 [7th ed 1999]). In *Rosner*, the Court of Appeals of New York was answering a certified question as to the meaning of the clause 'the date as of which a covered policy is first issued' as used in Section 3425(a)(7) of the Insurance Law. *Id.* at 477. While recognizing the above common definition of "issue," the court ultimately found that, to avoid rendering one other phrase in 3425(a)(7) surplusage, "date … issued" in that statute could only mean "effective date." *Id*. at 480.

For section 3420(a)(5), there is no reason not to apply the common definition of "issue" set out by the Court of Appeals. The definition "to send out or distribute officially" makes sense in the context of the statute and of this case. The statutory provision applies to certain policies "issued or delivered" in New York. These are concepts that represent the two sides of completing the transaction: sending and receiving, origination and destination, issuance and delivery. These terms involve a symmetry that makes the statute easy to understand and apply. It would not make sense to interpret "issue" to mean "the place where a piece of paper is signed that is scanned, stored and electronically applied to a policy at a later time." Defendants urge predictability in the application of policies, and predictability is exactly what would be achieved by construing section 3420(a)(5) using the common definition of "issued." An insured likely will not be aware in which state a corporate officer provides a signature for use in a policy, but it will be aware in which state a policy is sent for delivery based on the cover letter under which the policy is sent. That location was obvious here. (Stern Dec. II, Ex. 1 [McMahon Dep.], at 73:6-8) ("The cover letter is … on Exton letterhead.").)

Defendants ignore the plain meaning of the term "issue," instead citing a string of older cases (*Taggert*, *Stone*, *Avondale*, *Coleman*, and *Stringham*), that they contend establish that a policy is only "issued" where it is "signed."  But, none of these cases say that.  Indeed, almost all of these cases provide for alternative definitions of "issued," usually as either being "preparation and signing" or "delivery and acceptance."  *See*, *e.g.*, *Taggert v. Security Ins. Co. of New Haven, Conn.*, 277 A.D. 1051, 1051 (N.Y. App. Div. 2nd Dep't 1950) ("A policy of insurance is issued *when it is delivered and accepted*, whereby it comes into full effect and operation as a binding mutual obligation, *or when it is prepared and signed*, as distinguished from its delivery to the insured.") (emphasis added); *Stone v. Yan*, 125 A.D. 94, 96 (N.Y. App. Div. 4th Dep't 1908) ("issuing" used in passing without discussion of definition); *see also Avondale v. Sovereign Camp*, 134 Neb. 717, 721 (1938) ("The words 'issue,' 'issuance,' and '*issued*,' in reference to an insurance policy, are used in different senses, *sometimes as meaning the preparation and signing* of the instrument by the officers of the company, as distinguished from its delivery to insured, *and sometimes as meaning its delivery and acceptance*.") (emphasis added); *Coleman v. New England Mut. Life Ins. Co.*, 236 Mass. 552, 554 (1920) ("*Ordinarily* by the 'issue' of an insurance policy is meant its *delivery and acceptance* whereby it comes into full effect and operation as a binding mutual obligation. . . .  *Sometimes* it is used in the sense of the *preparation and signing* of the instrument by the officers, as distinguished from its delivery to the insured.") (emphasis added); *Stringham v. Mutual Ins. Co.*, 44 Ore. 447, 457-458 (1904) ("the term has a double application . . . it is susceptible of two constructions").

Importantly, these cases consider "signing" only in the context following "preparation."  That makes sense; pre-signing an incomplete policy or blank form cannot reasonably be considered when and where a policy is "issued."  In the case before this Court, any "signing" that happened in New York prior to and apart from "preparation" of this policy in Pennsylvania should have no significance on the place of issuance.  To the extent that issuance is where a policy is "prepared and signed," that happened exclusively in Pennsylvania for this policy.

In each of the cases cited by Defendants, the court either does not apply one definition over the other or resolves the issue based on principles of contract interpretation applicable to the situation before that court. *Taggert*, 277 A.D. at 1051 ("Under either theory [of the definition of 'issue,'] the policy was issued in New York."); *Stone*, 125 A.D. at 96 (never defining term); *see also Avondale*, 134 Neb. At 721 ("we do not think it is necessary to go into this question in any length" because statute was otherwise inapplicable); *Coleman*, 236 Mass. at 555 (applying neither of the alternative definitions, as the parties rejected both as different from the usage of the term in their contract); *Stringham*, 44 Ore. at 457 (term in policy was ambiguous and thus construed against insurer). These cases, when reviewed carefully, provide no support for Defendants' position that the location of signature is the location of issuance.

"Issued" as used in the context of this statute and this case should not mean "signed," and to so find would be contrary to any common and predictable understanding of that term.

### C.      Even If "Issued" Could Mean "Signed," The Location of Mr. Kane's Original Signature Would Be Irrelevant

Defendants may argue that *Rosner* holds that "issued" means "effective date," and that the Indian Harbor policy only became effective through Mr. Kane's signature. But, the date of Mr. Kane's original signing of a piece of paper in New York was not when this policy became effective. Under New York law, a contract is deemed made in the state where the *last act* necessary to make it binding takes place. *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 382 (1969). As discussed above, Mr. Kane signing his name for a general, stored electronic signature meant nothing with respect to this Indian Harbor policy – the signature pre-dated the compilation of the Indian Harbor policy. The "last act" here occurred after his and Ms. Perkins's signatures were placed with the policy and the policy was fully assembled – which occurred in Pennsylvania. The signatures alone, as stored on a computer, are not part of any insurance contract with the Defendants. *See, e.g.*, *Taggert*, 277 A.D. at 1052 ("Until the agent's signature was affixed as provided therein, no binding contract was in effect . . . .").

Moreover, even if the original signing place of an electronic signature were relevant to the inquiry of where a policy is issued, it is not Mr. Kane's signature that makes the policy finally effective. The "In Witness Endorsement" provides "if required by state law, this policy shall not be valid unless countersigned . . . ." (Stern Dec., Exh. 1 [Policy], at p. 20.) This policy was issued to California insureds, and California Insurance Code section 386 requires that policies be signed by the president (or listed alternatives) and "countersigned by the secretary of the corporation." Here, Ms. Perkins's signature appears as the required countersignature, and her office was located in Connecticut – not New York. (Stern Dec. II, Ex. 1 [McMahon Dep.], at 17:2-17:6 (stating that Ms. Perkins is located in Connecticut)); *Cf., Taggert*, 277 A.D. at 1052 ("the signing and preparation of the instrument were not completed until it was countersigned, by its terms"). Even under Defendants' theory, the last act necessary to "issue" the policy would be the secretary's countersignature, not the president's.

To hold that the policy will be deemed issued where an officer of the company signed his name unrelated to any specific policy would be an out-of-context application of one *potential* definition of the term "issue." This application is not even supported by the cases cited by Defendants, and does not comport with the ordinary definition that has been recognized (in this century) by the Court of Appeals of New York. After all, Mr. Kane could have signed his name in France, but it would be illogical to hold that all policies incorporating his signature were "issued" there.

### D.      There Are No Fact Issues Precluding Summary Judgment

Defendants argue in the alternative that because the parties have "conflicting positions" regarding where the policy was issued, this disputed fact precludes summary judgment. Defendants cite to *American Continental Properties, Inc. v. National Union Fire Insurance Company of Pittsburgh, P.A.*, 200 A.D.2d 443 (N.Y. App. Div. 1st Dep't 1994) ("*ACP*") in support of their argument. However, that case is distinguishable and not helpful.

*ACP* is distinguishable because its procedural determination happened in the context of New York State procedure under CPLR 3212, but that procedural standard for summary

9

judgment was (and is) materially different from the Federal Rule 56 standard for summary judgment.  *Compare* Fed. R. Civ. Pro. 56 ("The court *shall* grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.") (emphasis added); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (stating that one of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses), *with, e.g.*, *Simpson v. Term Industries, Inc.*, 126 A.D.2d 484, 487 (N.Y. App. Div. 1st Dep't 1987) (summary judgment "should not be granted . . . where the issue is even arguable").

*ACP* is not helpful because a reader cannot tell what, if any, fact was disputed: the opinion describes that the insurer address is listed as New York, the location of the insurers' officers is presumably in New York, and the countersignature endorsement is described as from Pennsylvania.  200 A.D.2d at 446.  No dispute on any of these facts is specified (*id.*), and it appears the appellate court was avoiding making a legal determination on the meaning of these facts by remanding the case.  Perhaps the case is best understood as reversing a ruling in favor of the insured that New York law and a portion of section 3420 applied when the insurer had lost a renewal motion to present new evidence of a Pennsylvania countersignature and on appeal was only seeking to demonstrate an issue of fact.  In any event, the case is not instructive in this procedural setting, where this Court can and should rule on the merits based on the undisputed evidentiary facts before it, and no material issue of fact has been identified.

*        *        *

The Indian Harbor policy was created when insurer personnel in Pennsylvania provided a quote, agreed to terms, invoiced the premium, and then generated a policy document that combined the insured- and contract-specific information with pre-existing Indian Harbor forms and pre-stored signatures from Indian Harbor officers.  The policy was not issued from New York, and no reasonable interpretation of "issue" leads to this result.  Thus, as a matter of law and undisputed fact, section 3420(a)(5) does not apply to the Indian Harbor policy.

**II.**     **Application of New York Law Pursuant to the Parties' Contractual Agreement to Do So Is Not Unconstitutional[2]**

    **A.**     **Defendants Overstate the Threshold for Constitutionality**

       The parties agree that *Allstate Ins. Co. v. Hague*, 449 U.S. 302 (1981) establishes the limit on what choice of law decisions can be constitutional given the requirements of Due Process and the Full Faith and Credit Clause: "In order to ensure that the choice of law is neither arbitrary nor fundamentally unfair, … the Court has invalidated the choice of law of a State which has had no significant contact or significant aggregation of contacts, creating state interests, with the parties and the occurrence or transaction."  449 U.S. at 308.  Defendants argue that this requires both a significant party contact and a significant occurrence/transactional contact.[3]  But, the case does not say that; it says that when there are no significant contacts of both types collectively, then the choice may be unconstitutional.  This is made clear in the very next paragraph of the decision, when the Court offers two instructive examples of reversing choice of law decisions when based "exclusively on the presence of one nonsignificant forum contact."  449 U.S. at 309; *see also Lehman Bros. Commercial Corp. v. Minmetals Int'l Nonferrous Metals Trading Co.*, 179 F.Supp.2d 118, 137 (S.D.N.Y. 2000) (constitutional question might arise only when the chosen state has "*no* connection to either the parties or the

---

[2] Indian Harbor notes that the Court has already stated that Defendants' argument that application of New York law is unconstitutional appears to be "without merit."  (*See* Transcript of 11/28/12 proceeding.)  Although the Court reserved final decision on this issue pending further arguments, Defendants have not raised any new arguments regarding this issue.

[3] Defendants cite *Cuccioli v. Jekyll & Hyde Neue Metropol Bremen Theater Produktion GMBH & Co.*, 150 F.Supp.2d 566, 574 (S.D.N.Y. 2001), for this contention, but that decision only quoted the *Allstate* wording and never made any finding that there must be significant transactional contacts for the choice to be constitutional.

transactions").  Two types of contacts are not required, and there is only a constitutional problem when there is only a nonsignificant contact.

In fact, the *Allstate* decision itself affirmed a choice to apply Minnesota law despite there being no Minnesota connection to the occurrence – an auto accident in Wisconsin.  The Court premised its ruling on the fact that "Minnesota has three contacts with the parties and the occurrence giving rise to the litigation," but these contacts were all party contacts, not occurrence contacts:[4] (1) the decedent worked in Minnesota, (2) the insurer did business in that state; and (3) the decedent's spouse who brought the action moved to Minnesota after the accident but before filing the lawsuit.  449 U.S. at 313-314, 317-318.

Defendants' argument for requiring a transactional contact to support a choice of law is disproven by the words, reasoning and result in the *Allstate* decision.  While, as described below, there are ample party and transactional contacts to support the constitutional application of New York law here, only one type of meaningful contact is required.

**B.    Application of New York Law is Not Arbitrary or Fundamentally Unfair**

**1.    New York Law Should Apply Because There Are Significant Transactional Contacts to New York**

There is nothing arbitrary or fundamentally unfair about applying the law the parties agreed would apply.  For Defendants to argue that there are "no transactional contacts with New York" is confounding in light of the fact that the transactional document itself – the insurance policy – provides for both New York law and an agreement to submit to the jurisdiction of New York.  Agreement to a particular law is perhaps the strongest type of transactional contact, such that "a court's power to apply its own state's law might be *virtually unlimited* when done

---

[4] The Court's use of "and" in a broad, collective sense in this context illustrates the broad, and not limiting, way it was using "and" in the phrase "with the parties and the occurrence or transaction" when stating the constitutional test.  *Compare* 449 U.S. at 313 *with* 449 U.S. at 308.

pursuant to the parties' own contractual choice."[5]  *Lehman Bros.,* 179 F.Supp.2d at 137 (emphasis added).  Indian Harbor should not have to go any further on this point – the consent of both parties to New York law in this transaction satisfies Due Process and allays any theoretical sovereignty concerns under the Full Faith and Credit Clause.  Defendants can cite no case finding unconstitutional a choice of one State's law pursuant to a choice of law clause. Applying New York law when it is what was agreed is logical and justified, not arbitrary or unfair.

Defendants' further briefing illustrates another meaningful contact: the policy requires and bears the signature of Indian Harbor's president, whose office is in New York.  Defendants attempt to sweep this contact under the rug, arguing that if the signature "is not sufficient to establish where the Policy is issued, it is also insufficient to establish a contact with New York that would pass constitutional muster."  (Opp at. p. 9.)  No authority is offered for this conclusory argument, and it does not have any basis in logic.  Issuance is not the only meaningful contact for constitutional purposes.  Indian Harbor has shown that Mr. Kane's signature that was provided prior to policy assembly could not itself constitute policy issuance, but that does not mean it was meaningless.  Indian Harbor does not dispute that Mr. Kane's signature was a required element of the policy; the supplying of the mandatory authorized signature for use by others was an early and necessary step in the process that leads to policy issuance –  just not the final step.  Because this was a required step in the issuance process, it was a meaningful transactional contact with New York.

---

[5] Note that Indian Harbor is not arguing that the power to apply a contractually consented choice of law is actually unlimited.  There are potential challenges to consent – such as fraud, overreaching, undue influence, or overweening bargaining power – that arguably render the contact provided by the choice of law clause without meaning and the consent unenforceable. *See*, *e.g.*, *Sun Forest Corp. v. Shvili*, 152 F.Supp.2d 367, 388 (S.D.N.Y. 2001); *Bristol Investment Fund Ltd. v. ID Confirm, Inc.*, 2008 NY Slip Op 30128U (N.Y. Sup. Ct. Jan. 14, 2008).  Defendants have not made or proven any such challenge here.

Finally, there is a transactional contact with New York in that the Claims Department that handled this claim (including Mr. McMahon) ultimately reports to a Global Head of Claims in New York.  (McMahon Dec. [Doc. No. 53], ¶ 19.)  *Cf. Smith v. Stonebridge Life Ins. Co.*, No. Civ. 03-1006, 2003 WL 21909567 (D. Minn. Aug. 8, 2003) (cited by Defendants) (the law of the state in which the insurer processed the claim could be constitutionally applied).  While this contact alone might not establish constitutionality, it can support the significance of other contacts, as did the move of the plaintiff to the forum state after the accident in *Allstate*.  449 U.S. at 318-319.

### 2.    New York Law Should Apply Because There Are Sufficient Party Contacts to New York

As set forth in Indian Harbor's moving papers, Indian Harbor itself has significant party contacts with New York, including that officers and directors of the company are located in New York, the General Counsel is in New York, and there are employees located in New York. (McMahon Dec., at ¶¶ 16-20.)  Moreover, Indian Harbor regularly issues policies to insureds domiciled in New York and policies insuring locations in New York.  (McMahon Dec., at ¶ 21.) And Indian Harbor has elected to include a New York choice of law clause in policies to "maintain uniformity, clarity, and consistency in the application of its policies, for the benefit of itself and its policyholders."  (McMahon Dec., ¶ 22.)  These party contacts are more numerous and at least as significant as those the Supreme Court found sufficient in *Allstate*.  449 U.S. at 313-314, 317-318 (workplace, authorization to do business, and post-occurrence residence).

The few cases cited by Defendants for the proposition that an individual party's contacts are insufficient for choice of law application are distinguishable, because all but one involved no choice of law or forum clause at all.  The clauses are themselves a meaningful contact, and cases that never considered such clauses cannot support a constitutional bar against enforcing such a clause.  In addition, each is distinguishable for other reasons.  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), involved far fewer contacts than exist here and involved a class action. The Court held that Kansas law did not apply to the determination of each of 28,000 class

14

members' claims, when "over 99% of the gas leases and some 97% of the plaintiffs in the case had no apparent connection to the State of Kansas except for this lawsuit" and when defendant's contacts were only that it owned property and conducted substantial business in the State. *Id.* at 814-815, 819. In *Bowers v. National Collegiate Athletic Ass'n, Act, Inc.*, 151 F.Supp.2d 526 (D.N.J. 2001), the dispute did not involve the overarching question of which state's law should apply but instead involved whether the New Jersey Law Against Discrimination act ("NJLAD") could be applied to defendants "because the NJLAD can not [sic] apply to places of public accommodation not located within New Jersey." *Id.* at 528. Therefore, the court was analyzing the contacts in an entirely different context. Lastly, in *Cuccioli* the Court was simultaneously addressing choice of law issues with respect to several contracts, only one of which contained a choice of law clause. 150 F.Supp.2d at 574. It is not the case, as Defendants argue, that the court in *Cuccioli* specifically found that there must be "significant contacts beyond choice of law provisions." These cases do not establish that Indian Harbor's party contacts with New York are insufficient to allow this Court to enforce the choice of law clause agreed to by Defendants.

3.   **New York Law Should Apply Because Application of New York Law is Not "Fundamentally Unfair"**

Defendants additionally argue that there is a special constitutional concern of fundamental unfairness in applying New York law in this case "given how Indian Harbor proposes to use it to deny the City coverage." (Opp. at p. 13.) This is essentially arguing that it would be unfair to apply the law to which Defendants agreed because Defendants will lose under that law. This argument is without merit, and application of the "fundamentally unfair" doctrine in that circumstance would lead to absurd results. The purported basis for this new level of scrutiny is not persuasive – a pair of quotes from Justice Stevens's concurrence in *Allstate*, which was not joined by any other Justice. 449 U.S. at 326-327. The main opinion in *Allstate* provides no support for a result-oriented test. Moreover, Justice Stevens made clear (two paragraphs after the last excerpt Defendants quote) that he thought the best way for the parties to a contract to ensure any future choice of law was fair and met their expectations was a choice of law clause:

"Contracting parties can, or course, make their expectations explicit by providing in their contract … that the law of a particular jurisdiction shall govern …."  449 U.S. at 328. Defendants' argument is fundamentally at odds with the authority from which it is drawn.

Defendants also argue that it would be fundamentally unfair to apply New York common law based on Pennsylvania issuance when "nowhere does the Indian Harbor Policy even mention Pennsylvania." Defendants' focus only on the face of the policy is careful sophistry.  Defendants in fact knew the policy was underwritten and issued in Pennsylvania based on the parties' course of dealings and because that is where the policy was sent from – a fact evident from the cover letter that enclosed the issued policy.  (Stern Dec. II, Ex. 1 [McMahon Dep.], at 73:6-8.) Notably, Defendants make no offer of evidence that they thought the policy was *not* issued in Pennsylvania, but that it *was* issued in New York.

Even if there is nothing on the face of the policy suggesting that it was issued in Pennsylvania, there is also nothing suggesting that the policy was issued in New York.  The first Declarations page of the policy identifies Indian Harbor offices in North Dakota and Connecticut, the third Declarations page identifies CSAC's office in California, and the fourth Declarations page identifies Defendants' broker's office in California.  (Stern Dec., Ex. 1 [Policy], at pp. 1-4).  Therefore, it would not be reasonable to believe that the policy was issued in New York – and thus that the choice of law clause made section 3420(a)(5) applicable – based on the face of the policy.

Defendants also argue that they would have "no reason to believe that their claims would not be subject to the notice-prejudice rule."  (Opp. at p. 14.)  This argument is essentially an "ignorance of the law" argument.  Defendants have not cited to a single case standing for the proposition that a party's purported ignorance of the law it agreed would apply makes application of that law "fundamentally unfair."  And no such rule of law would make sense, as it would be virtually impossible for parties to have uniformity and predictability in their contracting, and it would be too easy for parties to escape application of choice of law clauses to which they contractually agreed.  Moreover, Defendants have not offered any proof that they

16

actually had such a misunderstanding or ignorance of the law.  The face of the policy would lead any reasonable inquiry to conclude that New York's common law timely notice rule applied, rather than any other State's law or section 3420(a)(5).

Defendants chose to contract with Indian Harbor.  To invalidate the choice of law clause in such a circumstances is *not* fundamentally unfair to Defendants, but it would be fundamentally unfair to Indian Harbor, who contracted for New York law.  It also would be fundamentally unfair to overlook the New York choice of law clause that Indian Harbor bargained for and apply a notice-prejudice requirement that the Indian Harbor bargained out of, especially when the City failed to provide notice to Indian Harbor for over two and a half years.

There is nothing fundamentally unfair about applying New York law here, and New York law should apply.

### C.    Public Policy Arguments Do Not Compel Any Different Result

Defendants contend that the Court should refuse to apply the New York choice of law clause because it is contrary to California public policy.  Defendants' argument is inconsistent with the applicable law.  The *Allstate* decision explains how the Supreme Court has "abandoned the weighing-of-interest requirement" that had required balancing the public policies of the two jurisdictions in deciding whether a choice of law decision was constitutionally permissible.  449 U.S. at 308 n.10.  The only test now is whether there is any significant contact that creates a state interest, permitting the application of its law.  449 U.S. at 308.

The transactional and party contacts described above provide ample foundation for New York's interest and the constitutional application of New York law to this dispute.  New York furthermore has an important public policy and interest, as part of its interest in economic leadership generally, in deciding significant commercial disputes where the parties have specified New York law.  *See Lehman Bros.*, 179 F.Supp.2d at 137 (citing and quoting *Supply & Building Co. v. Estee Lauder Int'l, Inc.*, No. 95 Civ. 8136, 2000 U.S. Dist. LEXIS 2086 (S.D.N.Y. Feb. 25, 2000)) (stating that section 5-1401 "clearly does not include an exception for violations of another jurisdiction's public policy," that any purported public policy limitation to

the statute has been rejected by New York courts, and that section 5-1401 itself "codifies New York's 'strong public policy interest' in enforcing parties' contractual selections of New York law."). This "strong public policy interest" is sufficient to render constitutional any valid consent to having disputes resolved under New York law.

Moreover, the alleged public policy conflict has been overstated by Defendants. Those California cases that have faced a choice of law decision as to whether to apply New York's timely notice requirement have not found that California's interests override other factors. *Lincolnshire Mgmt. v. Seneca Ins. Co.*, 2002 Cal. App. Unpub. LEXIS 8669 (Cal. App. 4th Dist. Sept. 16, 2002); *see also Rosco, Inc. v. TIG Ins. Co.*, 1996 U.S. Dist. LEXIS 18697 (N.D. Cal. Dec. 5, 1996), *reversed by Rosco, Inc. v. TIG Ins. Co.*, 1998 U.S. App. LEXIS 2745 (9th Cir. Cal. Feb. 18, 1998).

There is no legal basis to find that any purported California public policy on the late notice issue trumps the New York Legislature's determination that New York has a strong public policy of enforcing New York choice of law clauses in the circumstances that apply here.

*     *     *

The parties chose New York law, and there is no basis not to enforce that choice. Indian Harbor is entitled to summary judgment under the New York common law timely notice requirement.

## III.   New York's "Timely Notice" Rule Applies

Defendants argue that this Court should predict that the New York Court of Appeals today would find that the notice prejudice rule applies as a matter of New York common law, in light of section 3420(a)(5). However, neither the New York Court of Appeals nor any other New York court has given any indication that New York would change its common law timely notice rule. In fact, all reported decisions are to the contrary. It therefore would be inappropriate to find that the notice prejudice rule applies to the Indian Harbor policy.

As recently as 2008, and after passage of section 3420(a)(5), the New York Court of Appeals continued to hold that "an insurer that does not receive timely notice in accordance with

a policy provision may disclaim coverage, whether it is prejudiced by the delay or not." *Briggs Ave. LLC v. Insurance Corp. of Hannover*, 11 N.Y.3d 377, 381-382 (2008). In *Briggs*, the Court recognized that section 3420(a)(5) had been passed, but the statute had not yet come into effect. The New York Court of Appeals had its opportunity to effect a sea change in New York common law in light of section 3420(a)(5), and for all policies not embraced by the provision, but declined to do so. The insured's delay in *Briggs* – based on not reporting a lawsuit it actually had no knowledge of – is certainly more understandable and worthy of sympathy that the City's two year and seven months of delay while it defended the claim itself; however, the Court of Appeals declined the opportunity to state a change in the common law then, and there is no reason it is more likely to do so now. In fact, *no* post-statute New York state or federal case has applied the notice prejudice rule to policies that do not fall under the explicit terms of the statute; New York courts have consistently continued to apply the common law timely notice requirement to those policies. *See* cases cited in Indian Harbor's Motion [Doc. 51], at p. 18; and Indian Harbor's Reply [Doc. 62], at pp. 4-5.

Based on *Briggs* and the long New York history of applying the timely notice requirement, Defendants' argument that the New York Court of Appeals would feel the need to change New York common law to match the majority of other states has no merit. *See*, *e.g.*, *Briggs*, *supra*; *Sorbara Constr. Corp. v. AIU Ins. Co.*, 11 N.Y.3d 805 (2008). While the majority of states may have adopted the notice prejudice rule, that has been the case for decades and has not altered the decision of the New York Court of Appeals to maintain the timely notice rule.

Nor has the Court of Appeals shown any inclination to "harmonize" the prejudice rules for all insurance policies. For example, while maintaining the timely notice rule for general liability policies, the Court of Appeals has applied a notice prejudice rule to reinsurance policies and policies providing "supplemental uninsured motorists" coverage. *Unigard Sec. Ins. Co. v North Riv. Ins. Co.*, 79 N.Y.2d 576 (1992) (reinsurance); *Brandon v. Nationwide Mut. Ins. Co.*, 97 N.Y.2d 491 (2002) (SUM coverage). The Court of Appeals decision to apply the notice

19

prejudice rule in those cases did not affect its subsequent application of the timely notice rule in other situations.  *See* cases cited, *supra*.

Moreover, Defendants' argument that there is a need to "harmonize" the prejudice rules ignores that there are several types of policies (other than ones that are not issued or delivered in New York) to which section 3420 does not apply.  For example, that section only applies to policies "insuring against liability for injury to person . . . or against liability for injury to, or destruction of, property" and would not apply to policies outside of that category.  N.Y. CLS Ins. § 3420(a).  Section 3420 further does not apply to certain policies covering "the liability of an employer for worker's compensation" or certain policies providing marine insurance.  N.Y. CLS Ins. § 3420(i); *Weeks Marine, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n*, 2011 U.S. Dist. LEXIS 95358, at *10-11 (S.D.N.Y. 2011) ("Thus, because the contract at issue in this case was issued and delivered before January 17, 2009, *and because it is a maritime insurance contract*, we must analyze it under New York's pre-amendment 'no prejudice' standard.") (emphasis added).

Defendants cite to *Hanson Production Co. v. Americas Insurance Co.*, 108 F.3d 627 (5th Cir. 1997) to urge this Court to predict that the Court of Appeals would apply a notice prejudice rule, but that case is entirely distinguishable.  In *Hanson*, the Fifth Circuit did not predict that the Texas Supreme Court would adopt the notice prejudice rule based solely on the Texas State Board of Insurance order; the Fifth Circuit specifically stated that it was "strongly influenced" by an actual Texas Supreme Court case: *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691 (Tex. 1994), rendered three years prior.  *See Hanson*, 108 F.3d at 630.  In *Hernandez*, the court held that an insurer must show prejudice before denying coverage under a settlement-without-consent clause in the insurance policy.  *Id.* at 692.  In doing so, the *Hernandez* court newly stated a general proposition under Texas law that when a party is not prejudiced by a breach of contract, it should not be relieved of its obligation under a contract.  *Id.* at 693.  The dissent in *Hernandez* argued that this holding was contrary to Texas' timely notice rule.  *Id.* at 694.

In *Hanson*, the Fifth Circuit held that: "The fundamental principle of contract law recognized in *Hernandez* – that a material breach by one contracting party excuses performance by the other party, and an immaterial breach does not – is equally applicable to notice cases." *Id.* at 630-631. The court further found that the failure to give notice is likely a smaller risk than the failure to obtain consent to a settlement, and that "[i]f the Texas Supreme Court does not presume prejudice in a settlement-without-consent case, we are persuaded that it would not presume prejudice in a failure-of-notice case." *Id.* at 631. Therefore, the *Hanson* court correctly guessed how the Texas Supreme Court would rule based on a very specific and recent case changing common law that all but revoked the timely notice rule – not based on the order by the Texas State Board of Insurance, as Defendants argue.

*Hanson* therefore involves a completely different situation than exists here, where the New York Court of Appeals has given no indication it would adopt a wide-reaching notice-prejudice rule. In fact, Defendants have not cited to a single New York case to demonstrate why this Court has reason to predict the New York Court of Appeals would adopt the notice prejudice rule. And, as set forth above, all New York cases are to the contrary. The *Hanson* court also stated that it believed the Texas Supreme Court would consider the law of other jurisdictions and the trend in the nation towards a notice prejudice rule. *Hanson*, 108 F.3d 627. However, the New York Court of Appeals has not been so influenced, standing by its timely notice rule despite what other jurisdictions were doing.

Further, this very Circuit has found that new sections of 3420 that enact limited pro-policyholder changes to New York common law do not result in a general change of that common law beyond the statute's provisions. *See Marino v. New York Telephone Co.*, 944 F.2d 109, 114 (2d Cir. 1991). In *Marino*, the Second Circuit continued to apply the common law against implied waiver by incomplete disclaimers because the policy was not "issued or delivered" in New York and, therefore, was not subject to the stricter rule set out in 3420(d). *Id.*

Notably, Defendants overstate their case in arguing for a complete adoption of the notice prejudice rule. Even if the New York Court of Appeals ever were to adopt the notice prejudice

rule, it surely would not adopt a rule that is broader than the limited notice prejudice carve-out in section 3420, which provides that the insured has the burden of proof when notice was provided more than two years late, as it was with respect to the *Grande North* claim here.  N.Y. GOL § 3420(c)(2)(A); *see also Sheehan Constr. Co. v. Cont'l Cas. Co.*, 938 N.E.2d 685, 690 (Ind. 2010) (applying common law limited notice prejudice rule).

Defendants argue that, without an indication of where the policy was issued, insureds will not know whether or not section 3420(a)(5) applies.  This ignores the very simple fact that an insured *does* know in which state a policy is issued, based on its course of dealings with the insurer and the state from which the policy is sent.  For example, here, the policy was sent to the insured under a cover letter from Exton, Pennsylvania.  (Stern Dec. II, Ex. 1 [McMahon Dep.], at 73:6-8.)  With that knowledge, a reasonable inquiry would reveal that the notice prejudice carve-out in section 3420(a)(5) did not apply to its policy.  As *Marino*, 944 F.2d at 114 stated: "The application of New York law does not mean that every New York statute, no matter how inappropriate or unrelated and regardless of its terms, should be applied."

Defendants are suggesting that if the City had known that a timely notice rule would apply, it would not have waited two years and seven months to tender to Indian Harbor.  This argument is flawed, yet revealing.  No reasonable insured would wait years to report a claim to an insurer simply because it believed a notice prejudice rule applied; there is always a risk of prejudice in such a period.  And to the extent Defendants are contending that the notice prejudice rule allows them to do so, that argument illustrates the moral hazard of the notice prejudice rule and should be rejected; New York's common law rightly gives no reward for such gamesmanship.  Further, Defendants have not proved that the City actually had such a belief or relied on the notice prejudice rule in failing to tender the claims sooner.

Given the limited situations in which the notice prejudice rule applies, the unanimous approach of New York courts declining to apply the notice prejudice rule when the statute does not apply, and the New York Court of Appeals applying different prejudice rules depending on

22

the type of policy, there is no basis for this Court to predict that the notice prejudice rule would apply to the Indian Harbor policy here.

**IV.**     <u>**The Centex Claim Was Late and Coverage is Barred as a Matter of New York Law**</u>

Defendants' argument that it had no obligation to tender the Centex claim when it was first made is illogical and does not preclude summary judgment for Indian Harbor on this claim.

There is no doubt that a "claim" – as that term is used in the policy – was made against the City when Centex submitted to the City a form entitled "Claim Against the City of San Diego," which alleged the City was responsible for $1.9 million in damages from defective and leaking pipes.  The Court of Appeal decision on which Defendants rely identifies that submission as a "claim": "In March 2012, Centex presented the City with a *claim* pursuant to section 900 et seq." (p. 4 (emphasis added)) and "Centex supported its motion with . . . documents related to Centex's March 2012 *claim* presented to the City" (p. 6 (emphasis added)).  The City therefore had an obligation to report that "claim" to Indian Harbor as soon as practicable under the terms of the policy.  (*See* Policy [Doc. 52-1], Section VII.A.); *Village of Sylvan Beach v. Travelers Indem. Co.*, 55 F.3d 114, 115 (2d Cir. N.Y. 1995) (holding that clear language of a contract should be enforced as written).

Defendants argue that the City only had an obligation to notify Indian Harbor once there was a "viable pollution liability claim."  First, the Court of Appeal of California did not find that Centex's claim was not "viable" at an earlier point in time, only that the claim had not yet accrued for purposes of arguing that the claim was barred.  That is a big difference.  In addition, nothing in the reporting provision of the policy states that notice need only be provided once a claim is "viable."  (*See* Policy [Doc. No. 52-1], at VII.A.)  Moreover, that argument makes no sense.  Notice is required of claim, not only of "viable" or valid claims. Meritless claims need to be investigated and defended just as much as, if not more than, meritorious claims.  Therefore, Defendants' position is not a reasonable reading of the notice provision.

A corollary of Defendants' argument would be that Indian Harbor has no obligation to defend or indemnify the City until Centex's claims are valid.  That would turn the duty to defend

on its head.  It is well-recognized in New York (and indeed, in U.S.) jurisprudence that an insurer's obligations to respond to a claim arise even if there is no valid claim.  *Boyce Thompson Inst. for Plant Research, Inc. v. Insurance Co. of North America*, 751 F.Supp. 1137, 1142 (S.D.N.Y. 1990) ("[T]he claims must be taken as pleaded, even if they are demonstrably groundless, false, or fraudulent."); *see also Schulman Inv. Co. v. Olin Corp.*, 514 F.Supp. 572, 575 (S.D.N.Y. 1981) ("[T]he insurer's obligation to shoulder the burden of litigation is determined by whether 'the allegations of the complaint … arguably refer to a case … within the broad coverage provision of the policy,' not by the objective truth or likelihood of the facts alleged.").  After all, had Indian Harbor's obligations under the policy been triggered, Defendants cannot seriously be contending that it would not have expected Indian Harbor to defend the City against Centex's efforts to bring the City into the case and defend the City in the appeal.  However, by Defendants' logic, Indian Harbor would have had no obligation to do so until sometime after Centex succeeded on appeal.  This is not and cannot be the law.

 Defendants alternatively argue that there is a dispute of fact regarding whether notice of the Centex claim was "as soon as practicable" when the claim was "largely dormant" during the nearly two month delay in notice to Indian Harbor.  This is the prejudice argument that has been rejected by New York courts for decades.  The Second Circuit has rejected these types of arguments in favor of a clear rule that notice must be provided "as soon as practicable."  *See*, *e.g.*, *American Home Assurance Co. v. Republic Ins. Co.*, 984 F.2d 76, 78 (2d Cir. N.Y. 1993) ("New York courts have held as a matter of law on numerous occasions that similar inexcusable delays in providing notice discharged an insurer's obligation to provide coverage.").  To the extent that *Mighty Midgets, Inc. v. Centennial Ins. Co.*, 47 N.Y.2d 12 (1979) can be read as holding otherwise, it is no longer good law on this point, as subsequent New York Court of Appeals cases have required strict compliance with the timely notice requirement.  *See*, *e.g.*, *Briggs*, 11 N.Y.3d at 380-382 (late notice bars coverage even when insured did not actually know of lawsuit, where it could have known if service address had been kept current); *Argo Corp. v. Greater N.Y. Mut. Ins. Co.*, 4 N.Y.3d 332, 339 (N.Y. 2005) ("Strict compliance with the

contract protects the carrier against fraud or collusion . . .; gives the carrier an opportunity to investigate claims while evidence is fresh; allows the carrier to make an early estimate of potential exposure and establish adequate reserves and gives the carrier an opportunity to exercise early control of claims, which aids settlement.").

Because the City did not notify Indian Harbor of the Centex claim for fifty-nine days, notice was late as a matter of New York law.  *See*, *e.g.*, *American Home Assurance Co.*, 984 F.2d at 78 (coverage is precluded because of a 36-day delay in notifying the insurer; citing multiple cases, including those where delays of 10 and 53 days have been held to preclude coverage).

## <u>CONCLUSION</u>

For the foregoing reasons and the reasons set forth in its moving papers, Indian Harbor respectfully requests that summary judgment be granted in its favor.


Dated: August 23, 2013

Respectfully submitted,

**DUANE MORRIS LLP**

Attorneys for Plaintiff Indian Harbor Insurance Company


    /s/ Max H. Stern
Max H. Stern

Max H. Stern (*pro hac vice*)                 Sheila Raftery Wiggins
Jessica E. La Londe (*pro hac vice*)         Jessica A. Bohl
DUANE MORRIS LLP                    DUANE MORRIS LLP
One Market, Spear Tower, Suite 2000     1540 Broadway
San Francisco, CA 94105-1104          New York, NY 10036
Telephone: 415.957.3000              Tel. (212) 692-1000
Facsimile: 415.957.3001              Fax. (212) 692-1020
mhstern@duanemorris.com          srwiggins@duanemorrs.com
jelalonde@duanemorris.com         jabohl@duanemorris.com

DM1\4092868