UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────

INDIAN HARBOR INSURANCE COMPANY,

                    Plaintiff,            12 Civ. 5787 (JGK)

      - against -             <u>OPINION AND ORDER</u>

THE CITY OF SAN DIEGO,

                 Defendant.

CALIFORNIA STATE ASSOCIATION OF
COUNTIES EXCESS INSURANCE AUTHORITY
and INSURANCE COMPANY OF THE STATE
OF PENNSYLVANIA,

       Defendant-Intervenors.
────────────────────────────────

JOHN G. KOELTL, District Judge:

    The plaintiff Indian Harbor Insurance Company ("Indian Harbor") brought this action against the City of San Diego ("the City") seeking a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that it has no duty to defend or indemnify the City for three pollution liability claims made against the City. Indian Harbor has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.  The California State Association of Counties ("CSAC") and the Insurance Company of the State of Pennsylvania, who are parties to related actions brought by Indian Harbor, have intervened in this action for the purpose of opposing the motion for summary judgment.  The Court has subject

matter jurisdiction based on diversity of citizenship pursuant to 28 U.S.C. § 1332.

This controversy arises out of a provision in a pollution and remediation legal liability insurance policy requiring the City to give notice of pollution liability claims to Indian Harbor "as soon as practicable."  The insurance policy contained a New York choice-of-law provision and insured risks in the State of California.  The parties dispute whether, under New York common law, Indian Harbor must show that it was prejudiced by any unreasonable delays in notifying Indian Harbor of any claims under the policy.  The parties also dispute whether New York law can constitutionally be applied to a dispute over pollution claims in California.

For the reasons explained below, Indian Harbor's motion for summary judgment is granted.

I.

The standard for granting summary judgment is well established. "The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs.

2

L.P., 22 F.3d 1219, 1223 (2d Cir. 1994).  "[T]he trial court's
task at the summary judgment motion stage of the litigation is
carefully limited to discerning whether there are genuine issues
of material fact to be tried, not to deciding them.  Its duty,
in short, is confined at this point to issue-finding; it does
not extend to issue-resolution."  Gallo, 22 F.3d at 1224.

The moving party bears the initial burden of "informing the
district court of the basis for its motion" and identifying the
matter that "it believes demonstrate[s] the absence of a genuine
issue of material fact."  Celotex, 477 U.S. at 323.  The
substantive law governing the case will identify those facts
that are material and "[o]nly disputes over facts that might
affect the outcome of the suit under the governing law will
properly preclude the entry of summary judgment."  Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a
court must resolve all ambiguities and draw all reasonable
inferences against the moving party.  See Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986)
(citing United States v. Diebold, Inc., 369 U.S. 654, 655
(1962)); see also Gallo, 22 F.3d at 1223.  Summary judgment is
improper if there is any evidence in the record from any source

from which a reasonable inference could be drawn in favor of the nonmoving party.  See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir.1994).  If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible . . . ."  Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir.1993); see also Scotto v. Almenas, 143 F.3d 105, 114–15 (2d Cir.1998) (collecting cases).

II.

Unless otherwise noted, the following facts are not in dispute.  Indian Harbor is a North Dakota company with its principal place of business in Stamford, Connecticut.  (Decl. of J. Robert McMahon in Supp. of Pl.'s Motion for Summ. J.[1] ("McMahon Decl.") ¶ 15.)  Indian Harbor is a subsidiary of XL Specialty Insurance Company ("XL Specialty"), which is incorporated in New York.  (McMahon Decl. ¶ 14.)  XL Specialty is responsible for handling claims for pollution and remediation legal liability policies issued by Indian Harbor.  (McMahon Decl. ¶ 14.)  Indian Harbor conducts its insurance business from

---

[1] The City has objected to the introduction of paragraph 5 of Mr. McMahon's declaration.  This objection is moot because the Court has not relied on that paragraph.

4

multiple locations in the United States, including a New York
office where its CEO, General Counsel, and half of its corporate
directors are located.  (McMahon Decl. ¶¶ 15-18.)  The City is a
chartered municipal corporation organized and existing under the
laws of California with its principal place of business in San
Diego, California.  (Am. Answer ¶ 3; Am. Compl. ¶ 3.)

A.

The Indian Harbor insurance policy that is the subject of
this action was issued in July 2009.  (Decl. of Max Stern in
Supp. of Pl.'s Motion for Summ. J. ("Stern Decl."), Ex. 1
("Policy") at 5.)[2]  It names the CSAC as the first named insured
to the policy and the City as an additional named insured.
(Policy at 4, 24.)  The policy was underwritten by XL Specialty
in its Exton, Pennsylvania office, and delivered under XL
Specialty letterhead to a broker in Newport Beach, California.
(Decl. of Max Stern in Supp. of Pl.'s Resp. to Defs.' Opp. to
Summ. J, Ex. 1 ("McMahon Dep.") at 14-15, 47-49; Policy at 1.)

The policy sets forth Indian Harbor's liability as follows:
<u>Coverage A – Pollution Legal Liability</u>
The Company [(Indian Harbor)] will pay on behalf of the
INSURED for LOSS and related LEGAL EXPENSE resulting from
any POLLUTION CONDITION on, at, under or migrating from any

---

[2] Citations to the page numbers in the policy are to the page
numbers in ECF Doc. No. 52-1.

COVERED LOCATION, which the INSURED has or will become
legally obligated to pay as a result of a CLAIM first made
against the INSURED during the POLICY PERIOD and reported
to the Company, in writing, by the INSURED, during the
POLICY PERIOD or, where applicable, the EXTENDED REPORTING
PERIOD.

<u>Coverage B – Remediation Legal Liability</u>

The Company will pay on behalf of the INSURED for
REMEDIATION EXPENSE and related LEGAL EXPENSE resulting
from any POLLUTION CONDITION on, at, under or migrating
from any COVERED LOCATION:

1. for a CLAIM first made against the INSURED during the
   POLICY PERIOD which the INSURED has or will become
   legally obligated to pay; or

2. that is first discovered during the POLICY PERIOD,

provided that the INSURED reports such CLAIM or POLLUTION
CONDITION to the Company, in writing, during the POLICY
PERIOD or, where applicable, the EXTENDED REPORTING PERIOD.

(Policy at 6.)

"Pollution condition," in turn, is defined as:

1. the discharge, dispersal, release, seepage, migration, or
   escape of POLLUTANTS into or upon land, or structures
   thereupon, the atmosphere, or any watercourse or body of
   water including groundwater;

2. the presence of any uncontrolled or uncontained
   POLLUTANTS into [sic] land, the atmosphere, or any
   watercourse or body of water including groundwater; or

3. the presence of MOLD MATTER on buildings or structures.

(Policy at 9.)

And "claim" is defined as:

any demand(s), notice(s) or assertion(s) of a legal right
alleging liability or responsibility on the part of the
INSURED and shall include but not be limited to lawsuit(s),
petition(s), order(s) or government and/or regulatory
action(s), filed against the INSURED.

(Policy at 7.)

6

The policy limits Indian Harbor's liability to $10,000,000 per pollution condition, with a $50,000,000 aggregate liability limit.  (Policy at 4.)  It also sets a self-insured retention amount of $500,000 per pollution condition.  (Policy at 4.)

The policy is a "claims-made and reported" policy.  (Policy at 4.)  As such, it requires "that a claim be made against the insured during the policy period and reported to [Indian Harbor] during the policy period or, where applicable, the extended reporting period."  (Policy at 4.)  The policy period is defined as running from July 1, 2009 to July 1, 2012.  (Policy at 4.)

In a section entitled "reporting, defense, settlement and cooperation," the policy states that

> [a]s a condition precedent to coverage hereunder, in the event any CLAIM is made against the INSURED for LOSS or REMEDIATION EXPENSE, or any POLLUTION CONDITION is first discovered by the INSURED that results in a LOSS or REMEDIATION EXPENSE:
>
> 1. The INSURED shall forward to the Company or to any of its authorized agents every demand, notice, summons, order or other process received by the INSURED or the INSURED's representative *as soon as practicable*; and
>
> 2. The INSURED shall provide to the Company, whether orally or in writing, notice of the particulars with respect to the time, place and circumstances thereof, along with the names and addresses of the injured and of available witnesses.  In the event of oral notice, the INSURED agrees to furnish the Company a written report *as soon as practicable*.

(Policy at 14 (emphasis added).)

7

Finally, in Clauses K and L of the conditions section, the parties agree 1) to submit to the jurisdiction of the New York state courts in controversies arising out of the policy, and 2) that the law of New York will govern all such disputes:

> K. Jurisdiction and Venue—It is agreed that in the event of the failure of the Company to pay any amount claimed to be due hereunder, the Company and the INSURED will submit to the jurisdiction of the State of New York and will comply with all the requirements necessary to give such court jurisdiction.  Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's right to remove an action to a United States District Court.

> L. Choice of Law—All matters arising hereunder including questions related to the validity [sic] interpretation, performance and enforcement of this Policy shall be determined in accordance with the law and practice of the State of New York (notwithstanding New York's conflicts of law rules).

(Policy at 18.)

B.

On August 13, 2009, the Grande North at Santa Fe Homeowners Association ("Grande North HOA") filed a claim ("Grande North Claim") with the Risk Management Department of the City.  (Stern Decl., Ex. 2 at 1.)  The claim alleged that sewer gases containing hydrogen sulfide were migrating on an ongoing basis from the City's sewer main along the Pacific Coast Highway into the Grande North HOA building systems, causing corrosion and other damage.  (Stern Decl., Ex. 2 at 1.)  The Grande North HOA

checked a box on its claim form indicating that damages were in excess of $10,000.  (Stern Decl., Ex. 2 at 2.)

In a letter dated August 24, 2009, the City declined to take action on the claim because it "was not presented within the 6 (six) months after the event or occurrence as required by law."  (Stern Decl., Ex. 3 at 1.)  It further stated that if the Grande North HOA chose to pursue the matter further, its "only recourse . . . [was] to apply without delay to the City of San Diego for leave to present a late claim. . . . Under some circumstances, leave to present a late claim will be granted." (Stern Decl., Ex. 3 at 1.)

In response to this denial, counsel for the Grande North HOA wrote a letter dated September 9, 2009, which explained that the claim involved a "potentially deadly condition," and requested "immediate and permanent repair."  (Stern Decl., Ex. 4 at 1-2.)  In a follow-up letter dated September 29, 2009, the City reaffirmed its denial of the claim, citing the Grande North HOA's late notice to the City.  (Stern Decl., Ex. 5 at 1.)  The Grande North HOA filed suit against the City on September 9, 2009, and the City was served on September 25, 2009.  (Stern Decl., Ex. 6 at 1, 3-4; Stern Decl., Ex. 7 at 18; Stern Decl. Ex. 8 at 1.)  In a memorandum from Christine Leone, Chief Deputy

City Attorney of San Diego, to Doug Taylor of the CSAC, dated October 19, 2011, Ms. Leone stated that the Grande North HOA was seeking $29 million in damages in connection with the Grande North Claim.  (Stern Decl., Ex. 11 at 1-2.)

James Coldren, Claims Representative for the City, first provided notice of the Grande North Claim to Indian Harbor in a memorandum submitted by email.  (Stern Decl., Ex. 13 at 3-4.) Indian Harbor asserts that notice occurred on March 26, 2012, while the City argues that it gave notice on March 23, 2012. (See Def.'s Rule 56.1 Stmt. ¶ 22; Pl.'s Rule 56.1 Stmt. ¶ 22.) The dispute as to the specific date is not material.  It is clear that the City provided notice of the claim to Indian Harbor more than thirty-one months after the City had received notice of the claim.

On April 4, 2012, Senior Claims Counsel for XL Specialty Insurance Group sent a letter to Mr. Coldren reserving its right to deny coverage for the Grande North Claim on the ground that notice was not submitted as soon as practicable, as required by the policy, and requesting information related to the claim. (Stern Decl., Ex. 14 at 1-3.)  On July 27, 2012, J. Robert McMahon, Assistant Vice President and Line Business Manager at XL Specialty, sent a letter to Mr. Coldren officially denying

10

coverage to the City for the Grande North Claim, on the same ground.  (Stern Decl., Ex. 15 at 1-4.)

C.

On May 19, 2011, the 235 on Market Homeowners Association ("235 on Market HOA") filed a claim ("235 on Market Claim") with the Risk Management Department of the City.  (Stern Decl., Ex. 16 at 1.)  This claim alleged ongoing "corrosion of sewer system piping" and also indicated that damages were in excess of $10,000.  (Stern Decl., Ex. 16 at 1-2.)  It further stated that this corrosion problem was "directly attributed to sewer gasses containing hydrogen sulfide (among other things) which originate in the City sewer main."  (Stern Decl., Ex. 16 at Attachment.)

The City denied this claim in a letter dated June 23, 2011 without citing its reason for doing so.  (Stern Decl., Ex. 17 at 1.)  The 235 on Market HOA then filed suit against the City on September 2, 2011, alleging causes of action in strict liability; breach of implied warranty; negligence; inverse condemnation; dangerous conditions; breach of fiduciary duty; breach of covenants, conditions and restrictions; and negligent misrepresentation.  (Stern Decl., Ex. 18 at 1, 3; Stern Decl., Ex. 19 at 1.)  The City was served on September 9, 2011.  (Pl.'s Rule 56.1 Stmt. ¶ 36; Def.'s Rule 56.1 Stmt. ¶ 36.)

The City asserts that it first gave notice of the 235 on Market Claim on May 24, 2012, while Indian Harbor argues that it received notice on May 25, 2012. (Def.'s Rule 56.1 Stmt. ¶ 38; Del Muro Decl. ¶ 10; Pl.'s Rule 56.1 Stmt. ¶ 38.) The dispute as to date is also immaterial. It is plain that the City provided Indian Harbor notice of this claim more than twelve months after it received notice of the claim.

In a letter dated June 7, 2012, Indian Harbor acknowledged receipt of the City's notice, reserved its right to deny coverage on the basis of, among other reasons, late notice, and requested information relating to the claim. (Stern Decl., Ex. 23 at 1-3.) On July 27, 2012, in a letter from Mr. McMahon to Mr. Coldren, Indian Harbor officially denied coverage to the City for the 235 on Market Claim, citing late notice as the ground for doing so. (Stern Decl., Ex. 24 at 1-4.)

D.

In a letter dated March 28, 2012, counsel for Centex Homes, Centex Real Estate Corporation, Centex Construction Company, Inc., and Balfour Beatty Construction Company, Inc. (collectively, "Centex") transmitted a claim ("Centex Claim") to the Risk Management Department of the City. (Stern Decl., Ex. 27 at 1-2.) The time stamp on the claim form indicates that it was received by the City on April 2, 2012. (Stern Decl., Ex. 27

12

at 2.)  The claim form alleged that "[o]n February 3, 2012, parties to the lawsuit Element Owners Association v. Centex Homes, et al. removed and inspected cast iron waste piping at [550 15th Street, San Diego, CA 92101] in response to Plaintiff's claims of defective and leaking pipes.  The inspections revealed crystallization on the piping as a result of hydrochloric gas emissions emanating from the city of San Diego's sewer system." (Stern Decl., Ex. 27 at 3.)  The amount of damages claimed was $1,914,496.79, and the form listed the date of the occurrence giving rise to the claim as February 3, 2012.  (Stern Decl., Ex. 27 at 2-3.)

On April 9, 2012, the City sent a letter to Centex stating that the "claim as presented, [was] insufficient" as to "[t]he date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted." (Stern Decl., Ex. 28 at 1.)  The City then formally denied the claim in a letter dated May 11, 2012 "because [the claim] was not presented within the 6 (six) months after the event or occurrence as required by law." (Stern Decl., Ex. 29 at 1.)

The City alleges that it gave notice to Indian Harbor of the Centex Claim on May 24, 2012, while Indian Harbor asserts that it received notice on May 25, 2012.  (Def.'s Rule 56.1

13

Stmt. ¶ 49; Pl.'s Rule 56.1 Stmt. ¶ 49.)  Once again, the
dispute as to the date is not material.  It is clear the City
waited almost two months before informing Indian Harbor of the
Centex Claim.

Subsequently, in August 2012, Centex filed a motion in the
action Element Owners Association v. Centex Homes for leave to
file a cross-complaint against the City for equitable indemnity
for damages relating to the event that gave rise to its April 2,
2012 claim against the City.  (Def.'s Notice of Supp. Authority,
Ex. A at 5; Stern Decl., Ex. 30 at 1-4.)  The Superior Court of
California, County of San Diego denied this motion, noting that
under California law, a claim for equitable indemnity against a
public entity "begins to accrue once a defendant has been served
with the complaint giving rise to the defendant's claim for
equitable indemnity or partial equitable indemnity."  (Stern
Decl., Ex. 30 at 3.)  It held that because the complaint brought
by the Element Home Owners Association against Centex Homes was
filed on April 20, 2009, Centex's equitable indemnity claim
against the City accrued on that date, at which point the one-
year statute of limitations began to run; the statute of
limitations therefore ran long before Centex filed its claim for
equitable indemnity in 2012.  (Stern Decl., Ex. 30 at 4.)

14

Pursuant to a petition for a writ of mandate, the California Court of Appeal, Fourth Appellate District reversed this decision, finding that the original complaint in Element Owners Association "did not encompass the claim for which Centex seeks indemnity from the City," and that instead a second amended complaint filed in the action "allege[d] the precise claim for which Centex seeks indemnity from the City." (Def.'s Notice of Supp. Authority, Ex. A at 2, 25.)  Thus, "Centex's equitable indemnity claim against the City accrued upon the Association's October 2012 service of the second amended complaint on Centex." (Def.'s Notice of Supp. Authority, Ex. A at 25.)

E.

The present case is an action for declaratory judgment brought by Indian Harbor against the City.  Indian Harbor seeks a declaration that it has no duty to indemnify the City for the Grande North, 235 on Market, and Centex Claims.  On July 29, 2013, the Court granted a motion allowing CSAC and the Insurance Company of the State of Pennsylvania to intervene as defendants in the action for the purpose of opposing Indian Harbor's motion for summary judgment.  Indian Harbor Ins. Co. v. City of San Diego, Nos. 12-cv-5787, 13-cv-3246, 13-cv-4029 (S.D.N.Y. July 29, 2013).  CSAC and the City (collectively, "defendants") have

15

now opposed the motion for summary judgment.  The Court has
limited the issue in this motion to whether Indian Harbor is
entitled to a judgment of no duty to indemnify the City on the
sole ground that the City failed to provide timely notice of its
claims to Indian Harbor.

III.

Indian Harbor argues that it has no duty to indemnify the
City because the City failed to satisfy a condition precedent
for coverage under the insurance policy—namely, that all claims
be submitted "as soon as practicable."

New York courts have construed the phrase "as soon as
practicable" in insurance contracts strictly.  Even relatively
short periods of delay have been found unreasonable as a matter
of law.  See, e.g., United Nat'l Ins. Co. v. 515 Ocean Ave., 477
F. App'x 840, 843-44 (2d Cir. May 1, 2012) (collecting New York
state cases that have found delays from between twenty-two and
fifty-one days unreasonable).  This policy of strict
construction serves multiple purposes.  It protects insurance
carriers against fraud and collusion by insureds.  See Argo
Corp. et al. v. Greater New York Mut. Ins. Co., 827 N.E.2d 762,
763 (N.Y. 2005); Unigard Sec. Ins. Co. v. North River Ins. Co.,
594 N.E.2d 571, 573 (N.Y. 1992).  It also allows carriers to
investigate claims while evidence is fresh; to make early

estimates of exposure; to establish adequate reserves; and to exercise early control over claims, which can facilitate settlement.  See Argo Corp., 827 N.E.2d at 763; Unigard Sec. Ins. Co., 594 N.E.2d at 573.

Despite this approach, New York courts have also emphasized that the test is a flexible one, and the duration of delay is to be assessed in "the factual context[] in which [it] arise[s]." Mighty Midgets v. Centennial Ins. Co., 389 N.E.2d 1080, 1084 (N.Y. 1979).  Thus, "as soon as practicable" requires ultimately that notice be given "within a reasonable time under all the circumstances." Sec. Mut. Ins. Co. v. Acker-Fitzsimons Corp., 293 N.E.2d 76, 79 (N.Y. 1972); see also Abner, Herrman & Brock, Inc. v. Great N. Ins. Co., 308 F. Supp. 2d 331, 337 (S.D.N.Y. 2004) (quoting Myers v. Cigna Prop. & Cas. Ins. Co., 953 F. Supp. 551, 556 (S.D.N.Y. 1997)).

Otherwise unreasonable delays are typically only excused under the circumstances if an insured can demonstrate "that the insured either lacked knowledge of the occurrence or had a reasonable belief of nonliability." Sparacino v. Pawtucket Mut. Ins. Co., 50 F.3d 141, 143 (2d Cir. 1995) (citing Commercial Union Ins. Co. v. Int'l Flavors & Fragrances, Inc., 822 F.2d 267, 271 (2d Cir. 1987)); see also Abner, Herrman & Brock, Inc.,

17

308 F. Supp. 2d at 337; Sec. Mut. Ins. Co., 293 N.E.2d at 79;

R&L Richmond Ave. Corp. v. Pub. Serv. Mut. Ins. Co., 867

N.Y.S.2d 340, 341 (App. Div. 2008) (slip op.); Winstead v.

Uniondale Union Free Sch. Dist., 565 N.Y.S.2d 845, 847 (App.

Div. 1991).  Thus, a valid excuse for an otherwise untimely

delay has been recognized where an incident in question was "so

trivial an occurrence that a reasonable person would not believe

that liability could possibly be imposed on the basis of it,"

Winstead, 565 N.Y.S.2d at 847, or where "[t]here was nothing in

the manner in which the accident occurred which would have

suggested the possibility of a liability claim against the

plaintiff . . . ." 875 Forest Ave. Corp. v. Aetna Cas. & Sur.

Co., 322 N.Y.S.2d 53, 54-56 (App. Div. 1971) (slip op.).  By no

means must there be a certainty—or even a significant

likelihood—that the policy at issue will be involved; a

"reasonable probability" suffices, and such a probability can

exist "even though there are some factors that tend to suggest

the opposite." Christiana Gen. Ins. Corp v. Great Am. Ins. Co.,

979 F.2d 268, 276 (2d Cir. 1992).  The burden of establishing

the reasonableness of a proffered excuse falls on the insured.

Olin Corp. v. Ins. Co. of N. Am., 966 F.2d 718, 724 (2d Cir.

1992); Great Canal Realty Corp. v. Seneca Ins. Co., 833 N.E.2d

1196, 1197 (N.Y. 2005); St. James Mech., Inc. v. Royal &

Sunalliance, 845 N.Y.S.2d 83, 85 (App. Div. 2007) (slip op.).

A.

The insurance policy at issue here states in relevant part:

*As a condition precedent* to . . . coverage . . . , in the
event any CLAIM is made against the INSURED for LOSS or
REMEDIATION EXPENSE, or any POLLUTION CONDITION is first
discovered by the INSURED that results in a LOSS or
REMEDIATION EXPENSE: . . . The INSURED shall forward to
[Indian Harbor] or to any of its authorized agents every
demand, notice, summons, order or other process received by
the INSURED or the INSURED's representative *as soon as
practicable* . . . .

(Policy at 14 (emphasis added).)  The first two pollution

liability claims that are the subject of this dispute—Grande

North and 235 on Market—are analytically identical for present

purposes.  The Grande North Claim was submitted to the City on

August 13, 2009; the City denied the claim on August 24, 2009;

suit was filed against the City on September 9, 2009; and the

City was served on September 25, 2009.  According to the City,

notice of the Grande North Claim was given on March 23, 2012—

more than thirty-one months after the City received notice of

the claim and more than thirty months after suit was filed

against the City.  A more than two-and-a-half-year delay in

notice is enough to shift the burden to the City to show the

reasonableness of any applicable excuse.  Cf. Rushing v.

Commercial Cas. Ins. Co., 167 N.E. 450, 451 (N.Y. 1929) (twenty-

19

two-day delay unreasonable); US Pack Network Corp. et al. v. Travelers Prop. Cas., 808 N.Y.S.2d 153, 153 (App. Div. 2005) (slip op.) (six-month delay unreasonable); Pandora Indus., Inc. v. St. Paul Surplus Lines Ins. Co., 590 N.Y.S.2d 471, 471 (App. Div. 1992) (thirty-one-day delay unreasonable).

The 235 on Market Claim was submitted to the City on May 19, 2011; the City denied the claim on June 23, 2011; suit was filed against the City on September 2, 2011; and the City was served on September 9, 2011. According to the City, notice of the 235 on Market Claim was given on May 24, 2012—more than twelve months after the City received notice of the claim and more than eight months after suit was filed against the City. Absent a justifying excuse, this delay is unreasonable as a matter of law. Cf. Rushing, 167 N.E. at 451; US Pack Network Corp., 808 N.Y.S.2d at 153; Pandora Indus., 590 N.Y.S.2d at 471.

The delay involved in submission of the Centex Claim presents a slightly different situation, but one which does not affect the outcome of the present motion. The City received the claim on March 28, 2012 and formally denied it on May 11, 2012. According to the City, notice was given to Indian Harbor on May 24, 2012. The delay between claim submission and notice to Indian Harbor was therefore just short of two months long.

20

On March 25, 2013, the California Court of Appeal, Fourth
Appellate District held that Centex's claim for equitable
indemnity from the City in Element Home Owners Association v.
Centex Homes had not accrued until the second amended complaint
was filed in that action, in October 2012.  (Def.'s Notice of
Supp. Authority, Ex. A at 25.)  Citing this event, the City
argues that its notice of the Centex claim was not late because
it was given before the related legal claim against the City had
even accrued.  (Def.'s Notice of Supp. Authority at 1-2.)

This argument is without merit.  The insurance policy
states that "[t]he INSURED shall forward to [Indian Harbor] or
to any of its authorized agents *every demand, notice, summons,
order or other process* received by the INSURED or the INSURED's
representative as soon as practicable."  (Policy at 14 (emphasis
added).)  When taken in light of the well-recognized purposes
for requiring prompt notice of claims—namely, allowing carriers
to investigate while evidence is fresh, to make early estimates
of exposure, to establish adequate reserves, and to exercise
early control over claims and settlement negotiations, see Argo
Corp., 827 N.E.2d at 763—it is clear that this language requires
notice to the carrier of *all* demands, notices, and process
received, not just the accrual of legal claims against the
insured.  Investigation, assessment of exposure and reserves,

21

and settlement negotiations may all begin before a legal claim
has technically accrued.  Indeed, claims for contribution or
indemnity would not accrue until a judgment or settlement has
been paid, see, e.g., Prudential Lines, Inc. v. Gen. Tire Int'l
Co., 440 F. Supp. 556, 558 (S.D.N.Y. 1977) (collecting cases),
but in order to be able to participate meaningfully in
investigation, negotiations, and litigation, insurance carriers
must receive notice of claims long before final judgment.  The
contractual notice provision cannot be said to apply only when a
legal claim has formally accrued.[3]

    In support of their argument that no delay occurred in
notifying Indian Harbor of the Centex Claim, the defendants also
point to language in the policy requiring notice "in the event
any CLAIM is made against the INSURED for LOSS or REMEDIATION
EXPENSE."  "Loss" and "remediation expense" are defined in the
policy as damages that are caused by a "pollution condition."
(See Policy at 7-9.)  Thus, the defendants argue, the obligation
to notify is not triggered until it has been established that a
viable pollution liability claim exists.  They also assert that

---

[3] It makes especially little sense for Indian Harbor to argue for
such a rule in the case of the Centex Claim, because the City
gave notice to Indian Harbor *prior* to formal accrual of the
claim as a matter of California law.

22

in the present case, this did not occur until a legal claim
against the City officially accrued.

This argument is also without merit.  The accrual of a
legal claim against the insured is irrelevant to the question of
whether a viable pollution liability claim exists.  The
requirement of providing notice of a claim to the insurer does
not require any adjudication of the validity of the claim.  It
would make no sense to provide for notice so that the insurer
can participate in determining the validity of a claim if notice
need only be given after the validity of a claim has been
established.  Moreover, the policy requires notice of "*every*
demand, order, notice, summons, or other process received by the
INSURED," as long as the claim is for damages caused by
pollution, (see Policy at 14 (emphasis added)), and the Centex
Claim was a claim allegedly caused by a pollution condition.

For these reasons, the Centex Claim triggered a duty to
notify Indian Harbor "as soon as practicable" after it was filed
with the City on March 28, 2012.  The delay between filing and
notice to Indian Harbor was just under two months.  This is
enough to establish unreasonableness as a matter of law, absent
some mitigating excuse.  Cf. Rushing, 167 N.E. at 451; US Pack

Network Corp., 808 N.Y.S.2d at 153; Pandora Indus., 590 N.Y.S.2d
at 471.

                                  B.

     The burden is therefore on the City, and the intervenors if
they choose to bear it, to proffer an excuse that would render
the reporting delays reasonable under the circumstances.  See
Abner, Herrman & Brock, Inc., 308 F. Supp. 2d at 337.  The
question of whether such an excuse exists is one of fact for the
factfinder, and cannot typically be resolved as a matter of law.
See Olin Corp., 966 F.2d at 724; Winstead, 565 N.Y.S.2d at 847-
48; St. James Mech., Inc., 845 N.Y.S.2d at 85.  However, when
the facts are undisputed or raise no inference of
reasonableness, judgment as a matter of law is appropriate.
Olin Corp., 966 F.2d at 724; St. James Mech., Inc., 845 N.Y.S.2d
at 85.

     The City has offered two justifications for its delays;
neither presents a triable issue of fact.  First, the City
argues that language in the policy requiring that claims be
"made against the Insured during the policy period and reported
to the Company during the policy period" renders all notice of
claims given within the policy period timely, regardless of
whether such notice was given as soon as practicable after the
claim was reported.  This argument ignores the fact that these

                                 24

two provisions create separate requirements with separate
purposes.  The purpose of requiring reporting within the policy
period is to afford the insurance carrier "greater certainty in
computing premiums, since it does not need to be concerned with
the risk of claims filed long after the policy period has ended,
and as a result the insured may benefit from lower premiums."
Checkrite Ltd. v. Ill. Nat'l Ins. Co., 95 F. Supp. 2d 180, 192
(S.D.N.Y. 2000).  The requirement that notice be afforded as
soon as practicable "protects the carrier against fraud or
collusion; gives the carrier an opportunity to investigate
claims while evidence is fresh; allows the carrier to make an
early estimate of potential exposure and establish adequate
reserves and gives the carrier an opportunity to exercise early
control of claims, which aids settlement."  Argo Corp., 827
N.E.2d at 763.  This difference has been implicitly recognized
in cases that give effect to strict compliance requirements in
claims-made insurance policies.  See Cade & Saunders, P.C. v.
Chi. Ins. Co., 307 F. Supp. 2d 442, 449 (N.D.N.Y 2004); Hunt v.
Galaxy Ins. Co., 636 N.Y.S.2d 194, 195-96 (App. Div. 1996).
Moreover, the city's argument would effectively read out the
requirement that notice be given as soon as practicable, and
require only that notice be provided during the policy period.
This argument would contravene the well-established principle

that each provision of a contract should be afforded meaning and not treated as surplusage.  See, e.g., Eastman Kodak Co. v. STWB Inc., 232 F. Supp. 2d 74, 91 (S.D.N.Y. 2002) (citing Two Guys from Harrison-N.Y., Inc. v. S.F.R. Realty Assocs., 472 N.E.2d 315, 318 (N.Y. 1984)).  The reporting period therefore has no bearing on the timeliness of notice of a claim.

Second, the City argues that its notice to Indian Harbor of the claims made against it was not late because in all three cases, notice was given before the self-insured retention amount in the policy had been met.  This argument fails in light of both the language of the policy at issue here and the general goals underlying New York's strict notice requirement.  The strict notice requirement says nothing about the policy's self-insured retention amount, which is in a completely separate provision of the contract and bears no evident relation to the requirement that notice of claims be given as soon as practicable.  Even before a self-insured retention has been exhausted, the carrier's interests that are protected by a prompt notice requirement—including interests in investigating the claim, establishing reserves, and exercising early control over the claim—are fully implicated.

Furthermore, there is no requirement that liability have ripened into a certainty before notice is required; a "reasonable probability" suffices.  Christiana Gen. Ins. Corp., 979 F.2d at 276.  The record indicates that by October 19, 2011—more than five months before the City gave notice to Indian Harbor of any of the claims at issue here—the City had reason to believe that its liability on the Grande North Claim alone could exceed $29 million, which is almost sixty times the self-insured retention of $500,000 in the policy.  (See Stern Decl., Ex. 11 at 1-2.) The City has proffered no evidence that would support a contrary inference.

Finally, neither of the City's two arguments supporting the reasonableness of its delays fall within the category of excuses that have to-date been recognized as justifying a delay that is otherwise unreasonable as a matter of law.  See Sparacino, 50 F.3d at 143 ("An insured's failure to give timely notice to its insurer may be excused . . . by proof that the insured either lacked knowledge of the occurrence or had a reasonable belief of nonliability." (citing Commercial Union Ins. Co., 822 F.2d at 271)); Abner, Herrman & Brock, Inc., 308 F. Supp. 2d at 337.  At no point in their briefs do the defendants argue that the City reasonably believed it would not be liable on any of the claims at issue here.  Nor could the defendants possibly argue that the

27

City was unaware of any of the claims at any point after the claims were first filed with the City.

Given that the durations of the City's reporting delays were unreasonable as a matter of law, and that the City has failed to meet its burden to show the reasonableness of the delays, Indian Harbor has successfully established that the City's notices of the Grande North, 235 on Market, and Centex Claims were untimely as a matter of law.

IV.

The defendants argue that Indian Harbor is not entitled to summary judgment because Indian Harbor is required to establish not only that it received notices of claims that were unreasonably late, but also that Indian Harbor was prejudiced as a result of the late notices.  Indian Harbor does not argue that it was prejudiced by the late notices.  Rather, it argues that the well-established and long-standing common law of the State of New York does not require a showing of prejudice.  The defendants urge this Court to find that the recently enacted Section 3420(a)(5) of the New York Insurance Law, which eliminates the "no-prejudice" rule, applies to the policy in this case.  Even if it does not, the defendants argue that Section 3420(a)(5) shows that the common law of New York has changed, and would now require a showing of prejudice.  However,

28

Section 3420(a)(5) does not apply to the policy in this case and there is no indication that the common law of the State of New York has changed.  Thus, Indian Harbor is not required to show prejudice from receiving late notices.  The City failed to comply with a condition precedent under the policy that it provide notice "as soon as practicable," and is thus barred from recovery for its late claims.

A.

New York courts have long recognized a "no-prejudice" rule governing strict compliance requirements in liability insurance contracts: where such contracts require notice of claims "as soon as practicable," the courts have held that "the absence of timely notice of an occurrence is a failure to comply with a condition precedent which, as a matter of law, vitiates the contract.  No showing of prejudice is required."  Argo Corp., 827 N.E.2d at 763 (citing Sec. Mut. Ins. Co., 293 N.E.2d at 78-80).

In 2008, the New York Legislature amended its Insurance Law to change the state's common-law no-prejudice rule with respect to liability insurance policies issued or delivered in New York. See 2008 N.Y. Sess. Laws 388 (McKinney); see also B & A Demolition & Removal, Inc. v. Markel Ins. Co., 818 F. Supp. 2d

29

592, 594-95 (E.D.N.Y. 2001).   Section 3420(a) of the New York
Insurance Law specifies certain provisions that must be included
in liability insurance policies issued or delivered in New York.
Section 3420(a)(5) now provides in relevant part that a
mandatory provision is as follows: "[a] provision that failure
to give any notice required to be given by such policy within
the time prescribed therein shall not invalidate any claim made
by the insured, injured person or any other claimant, unless the
failure to provide timely notice has prejudiced the
insurer . . . ."  N.Y. Ins. Law § 3420(a)(5).   Section
3420(a)(5) became effective on January 17, 2009, and it does not
apply retroactively to policies issued before that date.   See
Mt. Hawley Ins. Co. v. Abraham Little Neck Dev. Grp., Inc., 825
F. Supp. 2d 384, 394 (E.D.N.Y. 2011) (citing Sevenson Envtl.
Servs., Inc. v. Sirius Am. Ins. Co., 883 N.Y.S.2d 423 (App. Div.
2009) (slip op.)).   Thus, the no-prejudice rule governs policies
that were issued prior to January 17, 2009, and policies that
were "issued or delivered" outside of New York, while Section
3420(a)(5) governs policies "issued or delivered" in New York on
or after January 17, 2009 and requires an insurance carrier to
show prejudice before a claim can be barred for late notice
(deemed a "notice-prejudice" rule).   In the majority of
jurisdictions outside of New York, including California, the

notice-prejudice rule applies.  See <u>Prince George's Cnty. v.</u>
<u>Local Gov't Ins. Trust</u>, 879 A.2d 81, 94 n.9 (Md. 2005) (counting
thirty-eight states that use the notice-prejudice rule).

B.

The defendants argue that Section 3420(a)(5) applies to the
Indian Harbor policy.  While it is undisputed that the policy
was delivered in California, the defendants argue that the
policy was "issued" in New York.  It was issued in New York,
they assert, because it became valid upon signature by Dennis
Kane, an authorized representative of Indian Harbor, who had a
New York business address at the time he provided his signature
for the policy.  Indian Harbor responds that Mr. Kane's
electronic signature was actually affixed at Indian Harbor's
office in Exton, Pennsylvania, where the policy was prepared.
In any event, Indian Harbor argues, a policy is not issued when
it is signed, but, rather, when it is "sent out or distributed
officially," which, in this case, occurred in Exton,
Pennsylvania.

The New York courts have not expressly resolved the meaning
of the term "issued" in the insurance context, and both asserted
definitions—"prepared and signed" versus "sent out or
distributed officially"—find some support in the case law.  See
<u>Rosner v. Metro. Prop. & Liab. Ins. Co.</u>, 754 N.E.2d 760, 763

31

(N.Y. 2001) ("The term 'issue' has been defined as "[t]o send
out or distribute officially.'" (quoting Black's Law Dictionary
836 (7th Ed. 1999))); <u>Taggert</u>, 100 N.Y.S.2d 563, 565 (App. Div.
1950) (noting that one definition of "issued" in the insurance
context is "prepared and signed").  However, this uncertainty is
irrelevant here, because the only reasonable inference from the
facts in the record is that the policy was issued outside of New
York.

The undisputed facts with respect to issuance are as
follows.  Mr. McMahon testified that the policy was underwritten
by XL Specialty Insurance Company in its Exton, Pennsylvania
Office, and sent from there, under XL Specialty letterhead, to a
broker in Newport Beach, California.  (McMahon Dep. at 47-49;
<u>see also</u> Policy at 1 (indicating that XL Specialty letterhead
was used).)  Mr. McMahon testified that the underwriting file
showed

> email communications between the broker and [XL
> Specialty's] underwriting personnel, both prior to binding,
> prior to quoting, there is email communications from our
> underwriting personnel in Exton with regard to midterm
> endorsements that were issued.  There is internal paperwork
> and correspondence sending the policy over to the
> underwriting services group . . . to be coded, found [sic],
> issued, to generate the invoice, ultimately—all those
> things were done in Exton and it demonstrates signatures of
> people who did certain tasks, things like that and they're
> all Exton based personnel . . . .

(McMahon Dep. at 48-49.)  The policy was thus "sent out or distributed officially" from Exton, Pennsylvania, not from New York.

The signatures on the policy belong to Dennis Kane and Toni Ann Perkins, President and Secretary of Indian Harbor, respectively.  (Policy at 19.)  Mr. McMahon—who works in XL Specialty's Exton, Pennsylvania office—testified that the signatures on the policies are electronic signatures.  (McMahon Dep. 15, 20, 21.)  Such signatures are

> automatically placed on the appropriate policy endorsements and forms when they're printed in Exton.  They're not physically signed by Mr. Kane or Ms. Perkins.  They don't come down and put pen to paper, it's an electronic signature that's stored in a computer system.

(McMahon Dep. at 21-22.)  Mr. McMahon further emphasized that "all the signatures on the policies are all placed in Exton." (McMahon Dep. at 15.)

The uncontroverted evidence indicates that the electronic signatures of Mr. Kane and Ms. Perkins were affixed to the policy in Exton, Pennsylvania.  While Mr. Kane may have created his signature at his office in New York, creating an electronic signature for use on various policies over time could not be construed as the signing of a policy for purposes of issuing the policy.  If creating an electronic signature sufficed for

33

issuance, policies could be issued before they have even been
drafted.   Thus, if the defendants' position is correct and
"issued" means "prepared and signed," the legally relevant act
when an electronic signature is used is the act of affixing the
signature to the policy.   Cf. Taggert, 100 N.Y.S.2d at 565
("Until the agent's signature *was affixed* as provided therein,
no binding contract was in effect . . . ." (emphasis added)).[4]  It
is uncontroverted that the signatures of Mr. Kane and Ms.
Perkins were affixed in Pennsylvania.   Therefore, even using the
defendants' proffered definition of "issued," the policy was
issued outside of New York.

    Both possible definitions of "issued" lead to the same
conclusion—the policy was not issued in New York.   Therefore,
Section 3420(a)(5) does not apply to the policy at issue here.[5]

---

[4] Ms. Perkins's office was located in Connecticut, and there is
no evidence that she even created her electronic signature in
New York.   (McMahon Dep. at 17.)   The defendants rely on the
importance of the act of counter-signing the policy for purposes
of issuing the policy, but Ms. Perkins's signature is the
counter-signature on the policy, and there is no evidence that
her signature was either created or affixed in New York.

[5] The City has also argued that it had a reasonable expectation
that the policy was issued in New York based on the New York
choice-of-law clause in the policy.   The City has cited no
authority for why its expectations should change the law.   In
any event, the City has presented no evidence of such reasonable
reliance and there is no reason to assume it.   The evidence

C.

In the alternative, the defendants argue that even if the policy was issued outside of New York, the notice-prejudice requirement applies to the City's claims because Section 3420(a)(5) creates a new public policy for New York that changes the historic no-prejudice rule.  The defendants argue that all policies issued after January 17, 2009 should be governed by a prejudice requirement, regardless of where they were issued or delivered.

This argument is contrary to the multitude of cases decided after the enactment of Section 3420(a)(5) that have continued to apply the no-prejudice rule to insurance contracts issued prior to January 17, 2009.  See, e.g., Rockland Exposition Inc. v. Great Am. Assurance Co, 445 F. App'x 387, 389 n.1 (2d Cir. Nov. 2, 2011) (summary order); Mt. Hawley Ins. Co., 825 F. Supp. 2d at 394; 25 Ave. C New Realty, LLC v. Alea N. Am. Ins. Co., 949 N.Y.S.2d 2, 3 (App. Div. 2012) (slip op.); Tower Ins. Co. of N.Y. v. Classon Heights, LLC, 920 N.Y.S.2d 58, 62 (App. Div. 2011) (slip op.).  If it were contrary to New York public policy to apply the no-prejudice rule, as the defendants argue, there is no reason why New York courts would continue to apply the no-

shows that the policy was neither issued nor delivered in New York.

prejudice rule to policies falling outside the ambit of Section
3420(a)(5) because issued prior to January 17, 2009.  The
question of whether to abolish the common-law no-prejudice rule
is therefore a pure matter of public policy for the Legislature
and courts of New York to decide.  Until this occurs, the
notice-prejudice rule of Section 3420(a)(5) sweeps no more
broadly than the terms of the statutory provision itself, which
is limited to policies issued or delivered in New York after
January 17, 2009.

This conclusion finds further support in Marino v. New York
Tel. Co., 944 F.2d 109 (2d Cir. 1991), which construed a
different subsection of Section 3420 containing a nearly
identical phrase limiting applicability to policies issued or
delivered in New York.  Section 3420(d) in effect at the time
required insurers disclaiming coverage under liability policies
"delivered or issued for delivery in [New York]" to give written
notice of their having done so "as soon as is reasonably
possible." Marino, 944 F.2d at 113 (quoting N.Y. Ins. Law
§ 3420(d)) (emphasis omitted).  The Second Circuit Court of
Appeals held that Section 3420(d) did not apply to a policy
issued and delivered outside of New York. Id.  Nor did it
matter that the parties had contractually agreed that New York
law would govern the dispute: "It is a matter of common sense

36

that when the parties stipulated to the application of New York law they agreed to the application of the *appropriate* New York laws." Marino, 944 F.2d at 114 (emphasis added).  Hence, Section 3420(d) did not change the common law rule in New York. Id.  So too here.  Section 3420(a)(5) applies to policies issued or delivered in New York and has not changed the common law of New York.

D.

As a final theory as to why this Court should apply the notice-prejudice rule in this case, the defendants argue that application of the New York choice-of-law provision would be unconstitutional.  They contend that for this reason the Court should apply the law of California to the dispute.  California requires prejudice before an insurance carrier's duty to indemnify can be excused for late notice of claims.  Campbell v. Allstate Ins. Co., 384 P.2d 155, 156 (Cal. 1963) (en banc) (collecting cases).

Federal courts exercising diversity jurisdiction must "apply the law of the forum state in analyzing preliminary choice-of-law questions."  Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel, 346 F.3d 360, 365 (2d Cir. 2003) (internal quotation marks omitted).  New York General Obligations Law Section 5-1401 provides that "[t]he parties to any

37

contract . . . in consideration of, or relating to any
obligation arising out of a transaction covering in the
aggregate not less than two hundred fifty thousand dollars . . .
may agree that the law of [New York] shall govern their rights
and duties in whole or in part, whether or not such contract,
agreement or undertaking bears a reasonable relation to [New
York]." N.Y. Gen. Obl. Law § 5-1401.  Clause L of the Indian
Harbor policy states that all "questions related to the validity
[sic] interpretation, performance and enforcement of this policy
shall be determined in accordance with the law and practice of
the State of New York (notwithstanding New York's conflicts of
law rules)." (Policy at 18.)  Indian Harbor's aggregate
potential liability under the policy is $50 million, (Policy at
4), and, as a pure statutory matter, the parties do not dispute
the applicability of Section 5-1401 to the policy.  Hence, it is
plain that, under Section 5-1401, New York law calls for
enforcing the parties' New York choice-of-law provision and
appling New York law to the parties' dispute under the policy.
See Usach v. Tikhman, Nos. 11-cv-954 & 11-cv-1472, 2011 WL
6106542, at *6 (S.D.N.Y. Dec. 7, 2011) ("For agreements
governing transactions worth more than $250,000, the parties'
New York choice of law clause is enforceable even if, under a
traditional choice of law analysis, the application of the

chosen law would violate a fundamental public policy of another, more interested jurisdiction." (quoting Tosapratt, LLC v. Sunset Props., Inc., 926 N.Y.S.2d 760, 770 (App. Div. 2011) (slip op.) (internal quotation marks omitted)).

The defendants argue that the application of New York law to the coverage dispute under the policy would be unconstitutional.  The leading precedent on constitutional choice-of-law questions is Allstate Ins. Co. v. Hague, 449 U.S. 302 (1981).  In Allstate, the Supreme Court confirmed that the application of a particular state's law to a given conflict must comport with both the Due Process and Full Faith and Credit Clauses.  449 U.S. at 308 (plurality opinion).  Under both provisions, courts must examine "the contacts of the State, whose law was applied, with the parties and with the occurrence or transaction giving rise to the litigation."  Id. at 308; see also Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co., 179 F. Supp. 2d 118, 137 (S.D.N.Y 2000).  Ultimately, the question is whether the state has "a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair."  Allstate, 449 U.S. at 313 (plurality opinion).

When the parties have contractually agreed to the application of New York law to a monetarily significant transaction, it would require extraordinary circumstances to find that choice of law to be unconstitutional.  See, e.g., Lehman Bros. Commercial Corp., 179 F. Supp. 2d at 136-37; Usach, 2011 WL 6106542, at *5-6.  This is because the constitutional contacts analysis required under Allstate effectively boils down to a question of "whether a court's application of its own state's law is arbitrary or fundamentally unfair," and it is hardly unfair or arbitrary to honor the contractual choice of the parties in a substantial transaction.  Lehman Bros. Commercial Corp., 179 F. Supp. 2d at 137; see also Tosapratt, 926 N.Y.S.2d at 771 ("[E]nforcement of [choice-of-law] clauses is favored since it protect[s] the justifiable expectation of the parties who choose New York law as the governing law." (internal quotation marks omitted) (third alteration in original) (quoting IRB-Brazil Resseguros, S.A. v. Inepar Invs., S.A., 922 N.Y.S.2d 308, 311 (App. Div. 2011) (slip op.))).

The defendants have acknowledged that they are aware of no case that has found the application of a contractual New York choice-of-law caluse, or Section 5-1401 of the New York General Obligations Law, to be unconstitutional.  The defendants rely on dicta in Judge Keenan's decision in Lehman that the reach of

Section 5-1401 may not be unlimited.  See Lehman, 179 F. Supp.
2d at 137 ("It remains to be seen, however, whether a state with
no connection to either the parties or the transactions could
apply its own law, consonant with the Full Faith and Credit
Clause, when doing so would violate an important public policy
of a more-interested state.").  But Lehman, in fact, followed
Section 5-1401 and applied a New York choice-of-law provision,
and emphasized that "a court's power to apply its own state's
law might be virtually unlimited when done pursuant to the
parties' own contractual choice." 179 F. Supp. 2d at 137.  The
parties in Lehman had not even raised any constitutional
arguments against application of New York law to the
controversy, and the court found "no such restrictions [to be]
apparent under the[] circumstances." Id.

    There are circumstances in which a contractual choice-of-
law clause could be unenforceable because it was procured by
fraud or overreaching, but there is no evidence that any such
circumstance was present in this case.  See Innovative
BioDefense, Inc. v. VSP Techs., Inc., No. 12-cv-3710, 2013 WL
3389008, at *4 (S.D.N.Y. July 3, 2013) ("[T]he parties' choice
of law provision is enforceable [pursuant to Section 5-1401],
unless procured by fraud or overreaching." (citing Tosapratt,
926 N.Y.S.2d 760)).

41

As part of their constitutional challenge, the defendants emphasize the public interest of California in applying its notice-prejudice rule.  But the Supreme Court has emphasized that it has disavowed a weighing of interests analysis under the Full Faith and Credit Clause, and that the test under that Clause is the same as the test under the Due Process Clause.  See Allstate, 449 U.S. at 308 n.10 (plurality opinion).  In any event, as Lehman recognized, Section 5-1401 "implicates . . . policies that are vitally important not only to contracting parties but also to New York and to the international community."  179 F. Supp. 2d at 138; see also Supply & Bldg. Co. v. Estee Lauder Int'l, Inc., No. 95-cv-8136, 2000 WL 223838, at *3 (S.D.N.Y. Feb. 25, 2000).  Such public policy includes promoting "New York's status as an international financial center . . . [and] providing a stable body of law that sophisticated international parties may designate to structure their transactions and disputes."  Usach, 2011 WL 6106542, at *5 (citing Banco Nacional de Mexico, S.A. v. Societe Generale, 820 N.Y.S.2d 588, 592 (App. Div. 2006) (slip op.)).  While California may have its own interests, it is not for the Court to balance those interests against New York's.  The Full Faith and Credit Clause therefore poses no bar to application of New York law to the present dispute.

42

Against this background, there can be no question that enforcement of the parties' choice-of-law clause poses no constitutional problem.  The parties freely decided to have New York law applied to this substantial dispute and also agreed in their contract on a New York venue for certain disputes.  Indian Harbor has significant contacts with New York, including its New York office, out of which its CEO-President-Chairman, its General Counsel, and four of its eight corporate directors operate.  Cf. Allstate, 449 U.S. at 313-318 (plurality opinion) (noting the significance of various generic contacts between the parties to the dispute and the state whose law was sought to be applied).  Moreover, Indian Harbor is authorized to issue insurance liability policies in New York, and it regularly issues policies that insure locations in New York and parties domiciled in New York.  Indeed, Mr. Kane, whose signature was affixed to the policy at issue here, had his office in New York at the time the policy was issued.  Absent fraud or duress—of which there is no evidence here—there is nothing unfair about enforcing the parties' choice-of-law clause.[6]

---

[6] The defendants argue that while Indian Harbor has significant contacts with New York, they are only generic contacts and not contacts with respect to the specific occurrence or transaction in this case—namely the pollution claims in California.  The defendants point to language in Allstate that refers to

43

For these reasons, there is no constitutional bar to the application of New York law to this controversy.


V.

As a final matter, the defendants assert that even if Indian Harbor's performance should otherwise be excused because of the City's failure to satisfy a condition precedent, the contract should nevertheless be enforced because failure to do so would work a disproportionate forfeiture on the City.

The Second Restatement of Contracts calls for courts to excuse contractual conditions in order to avoid forfeiture under certain limited circumstances: "[t]o the extent that the

---

"contacts of the state, whose law is to be applied, with the parties and with the occurrence or transaction giving rise to the litigation."  449 U.S. at 308 (plurality opinion).  However, Allstate did not involve a contractual choice-of-law provision, and the ultimate test the plurality opinion applied was to determine whether the choice of law was "neither arbitrary nor fundamentally unfair."  Id.  It is difficult to divorce the Indian Harbor insurance contract with its choice-of-law provision from the specific occurrence or transaction at issue in the case.  This is an insurance coverage dispute about the coverage of an insurance contract with a New York choice-of-law provision.  In Allstate, the Supreme Court took a very expansive view of what constituted a connection to the occurrence or transaction, even though the automobile accident that was the basis for the insurance claim occurred in a different state from the state whose law was applied.  See id. at 314-15 & nn.19 & 20.  In this case, there were ample relevant contacts to justify the enforcement of the New York choice-of-law provision.

44

non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange." Restatement (Second) of Contracts § 229. Excuse of a condition under this doctrine requires that the party seeking performance have "relied substantially" on the bargained-for exchange. See Pramco III, LLC v. Partners Trust Bank, 842 N.Y.S.2d 174, 185 (Sup. Ct. 2007) (slip op.); Restatement (Second) of Contracts § 229 comment b. The New York courts have applied this rule in a few limited circumstances, see, e.g., Pramco III, 842 N.Y.S.2d at 184-86, but never in the context of a late-notice insurance case.

There is no reason to excuse the City's failure to comply with the timely notice requirement in this case. It is not reasonable for an insured to rely on an insurance carrier's performance after sitting on a claim for weeks or months without reporting it, in the face of a clause calling for notice of claims as soon as practicable and decades of precedent interpreting such clauses strictly. Further, New York courts have repeatedly emphasized the importance of timely notice to an insurer to protect against fraud; allow the insurer an opportunity to investigate, control, and settle claims; and to estimate potential exposure and establish adequate reserves.

45

<u>Argo Corp.</u>, 827 N.E.2d at 764.  Indeed, the New York Court of Appeals has made it plain that failure to provide timely notice, in the face of a contractual requirement, "is a failure to comply with a condition precedent, which, as a matter of law, vitiates the contract."  <u>Id.</u>

The doctrine of disproportionate forfeiture is therefore inapposite, and it will not excuse the City's failure to satisfy the condition precedent in its contract with Indian Harbor.


                           CONCLUSION

For the reasons explained above, the City's notice to Indian Harbor of the Grande North, 235 on Market, and Centex Claims was untimely.  Indian Harbor has therefore established that it is entitled to declaratory judgment of no duty to indemnify the City as a matter of law for these claims.  To the extent not specifically addressed above, all other arguments raised by the parties are either moot or without merit. Accordingly, Indian Harbor's motion for summary judgment is **granted**.  The Clerk is directed to **close Docket No. 50**.

Indian Harbor is directed to submit a proposed judgment within four days of the date of this opinion.  The defendants

                              46

may submit any objections or counter-judgments two days

thereafter.

**SO ORDERED.**

**Dated:**      **New York, New York**
           **September 25, 2013**        _____/s/_____
                                            **John G. Koeltl**
                                **United States District Judge**